**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KEEP CHICAGO LIVABLE, an Illinois not-for-profit corporation, and BENJAMIN THOMAS WOLF, as an individual and on behalf of all others similarly situated, )<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff, ) | |
| v. ) | NO.    1: 16-cv-10371 |
| )<br>) | |
| THE CITY OF CHICAGO, a Municipal corporation, )<br>)<br>) | |
| Defendant. ) | |

## CLASS ACTION COMPLAINT
## FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF,

NOW COME plaintiffs KEEP CHICAGO LIVABLE, an Illinois not-for-profit corporation ("KCL") and BENJAMIN THOMAS WOLF, as an individual and on behalf of all others similarly situated ("Wolf", and together with KCL, "Plaintiffs"), by and through their respective undersigned attorneys, and complain of and seek declaratory judgment and injunctive relief against defendant THE CITY OF CHICAGO, a municipal corporation ("Defendant" or the "City"), as follows:

## INTRODUCTION

1.      This complaint is brought by KEEP CHICAGO LIVABLE, a non-profit formed by Chicago residents, and BENJAMIN THOMAS WOLF, as an individual and as a putative class action representative on behalf of all others similarly situated, regarding the constitutionality of the City of Chicago's new Shared Housing Ordinance, as described below.

2.      The Shared Housing Ordinance, which purports to attempt to regulate the phenomenon of home sharing on internet sites such as Airbnb, HomeAway, FlipKey and VRBO, in fact operates as a *de facto* and in some cases outright ban on the use of internet home sharing services, and violates the constitutional rights of Chicagoans to speak and communicate freely and anonymously on the internet, to use their own property, to have privacy, and to not be subject to arbitrary and discriminatory enforcement of the laws.

3.      The new law also violates the Stored Communications Act, 18 U.S.C. 2701, *et seq.*, by requiring third-party internet service providers to provide reports to the City of its users' personal information, electronic communications, transactional history and other stored electronic information, without a search warrant or a "2703(d)" order finding that there are "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic information, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

4.      Even worse, this new law is designed as a particularly cruel trap for the

unwary – in this case, more than 6,000 Chicagoans. The rules and regulations come with fines of between $3,000 to $5,000 *per day per violation*. These penalties are buried inside 57 pages of dense and impenetrable legalese that the City knew, or should know, that ordinary citizens would never read or fully understand.

5.     With this law, the City of Chicago creates a new power for itself unprecedented in the United States: the power to force its citizens to forfeit their anonymity and register before they participate socially on the internet. The Shared Housing Ordinance also marks the first time that the City of Chicago (or upon information and belief, any local or state government in the United States) has ever attempted to force a third-party internet provider ("ISP") to divulge the confidential transactional and user information of the ISP's subscribers, without a warrant, without court supervision and without the user's consent.

6.     Because this law goes into full effect on or about December 19, 2016, Plaintiffs request that this Honorable Court expedite a hearing on both class certification and/or as to whether a preliminary injunction should issue so that the myriad Constitutional issues can be examined and implementation of this law can be put on hold.

## PARTIES, JURISDICTION AND VENUE

7.     Plaintiff KEEP CHICAGO LIVABLE is a grassroots not-for-profit corporation in the State of Illinois, formed by hosts, for hosts, and made up of hosts. Plaintiff's principal place of business is at 125 South Clark Street, Floor 17, in Chicago, Cook County, Illinois.

8.     The purpose of Keep Chicago Livable is to educate other Chicago owners and

renters as to their rights and duties to participate in home sharing and to assist them with compliance with both state and local law as well as internally developed "best practices" for responsible home sharing.

9.      Plaintiff BENJAMIN THOMAS WOLF is an individual citizen who resides in the City of Chicago, Cook County, State of Illinois.

10.      Mr. Wolf has participated on Airbnb as a host and/or as a guest from time to time since 2012, and owns property in the City of Chicago that he either has used in the past for Airbnb purposes or that he intends to use for such purposes in the future.

11.      The City of Chicago is a municipal corporation in the State of Illinois.

12.      Plaintiffs institute these proceedings and invokes the jurisdiction of this Court under and by virtue of 28 U.S.C. § 1331, 28 U.S.C § 1343(a)(3), 28 U.S.C. § 1367(a), 28 U.S.C. § 2201(a), and 42 U.S.C. § 1983, because Plaintiffs seek a declaratory judgment as to the meaning of the Shared Housing Ordinance, to the extent any comprehensible meaning can be ascertained, and its constitutionality, under the United States Constitution and the Illinois Constitution of 1970.

13.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because all parties reside in this judicial district.

## BACKGROUND

14.      Sharing one's home is one of the oldest and most personal forms of hospitality.   The very notion of having a home is inextricably intertwined with the ability

to host and to shelter friends, family and guests. Hospitality between a host and guest has always been on mutually agreeable, private, largely customary terms – some accommodations for short periods of time, for close families and friends and/or for very distinguished guests are provided free of charge and without any expectation of recompense, whereas other accommodations are provided upon mutually acceptable terms and conditions with a guest, ranging from an exchange of favors or the performance of chores, to the outright payment of cash or other consideration.

15. While the custom of hosting has not changed substantially over time, technology has facilitated a global phenomenon that has made "home sharing" safer, more convenient and more rewarding for all involved. There are several different internet platforms that offer the ability for "guests" and "hosts" to make arrangements for accommodations under a variety of different pretenses, from private housing clubs, vacation rentals, short-term rentals, sublets, roommate finders, corporate housing, to bed-and-breakfasts.

16. The growth of this phenomenon (through platforms such as Airbnb) has led to a reaction by municipalities, including the City of Chicago, based largely out of fear and misunderstanding, mixed with economic protectionism from the hotel and motel industry.

**A. How Sites Such As Airbnb Works**

17. Although there are many different internet-based platforms that facilitate "home sharing," one of the most popular is Airbnb. Accordingly, this section of the

Complaint focuses on how Airbnb works.

18.     Airbnb serves as a platform that facilitates a social interaction between a host and a guest to arrange for a stay.   While most of the "stays" booked on Airbnb are short-term, it is entirely possible to arrange for a longer-term stay of weeks if not months through Airbnb.

19.     Sites such as Airbnb are membership or subscriber-based sites, where the economic transactions can only occur between a person and Airbnb if the putative members (both host and guest) agree to Airbnb's Terms of Service (*see* http://www.airbnb.com/terms).

20.     There are three related but distinct transactions that occur on sites such as Airbnb: a pair of parallel economic transactions (between host and Airbnb, and between guest and Airbnb), and a social transaction, directly between host and guest.

21.     A would-be "host" creates a "listing" that contains a profile of their home and themselves, as well as their own "house rules" and building rules and amenities. A "listing" is akin to a Facebook profile, but for one's own home.

22.     While basic information about "listings" can be viewed by non-members (or members of the general public), such "listings" do not reveal the full name of the host, contact information for the host, or the address of the space.   Additionally, non-members cannot communicate with the host without requesting to book, and prior to the host accepting such request.

23.     On the right-hand side of a "listing" are interactive boxes for a potential guest

to input his or her ideal "check in" and "check out" dates, as well as identifying the number of guests, and a "Request to Book" button that states that "Your credit card won't be charged yet."

24.     Hosts have two options in terms of making their space available for "booking" by member-guests.   First, a "host" can turn on a feature called "insta-booking," which allows the host's space to be reserved or booked immediately by a member-guest. Second, the "host" can turn off or limit the "insta-booking" feature, which means that an interested member-guest can only "request to book."   As a default setting, the "insta-booking" feature is turned off.

25.     A non-member could also save a particular listing to a "wish list" (and view how many other travelers saved that particular listing to a "wish list"), email or Facebook messenger this listing to someone else, or even "Pin" a particular "dream listing" to a "Pinterest" page.

26.     Airbnb also provides the ability for bidirectional reviews, of the host by the guest, and vice versa. Reviews of a host and of a listing – including star ratings from 1 to 5 and narratives – are visible to anyone.

27.     A would-be guest that views a desirable listing commits to pay money to Airbnb, in exchange for Airbnb making its member-hosts available for communication and potential booking, and further in exchange for a set of dispute resolution mechanisms, support services, accounting services and payout procedures if a booking is consummated.

28.     If a member-guest requests to book a host's listing, the member-guest typically will write a short note explaining who the member is, why the member is visiting the city, and what the member likes about the host and the listing. The member also has the option to request a special offer, or to suggest a lower or even a higher price.

29.     Provided that "insta-booking" is turned "off," a host that receives a request for a booking has the option to accept the request, decline the request, ask for additional information or even propose a "special offer" including different dates, or higher or lower prices.

30.     A guest pays Airbnb at the time of a confirmed booking, including any additional security deposits or fees, but a host does not receive a payout until a certain time period after the guest enters the home, provided that neither the guest nor the host has reported an objectionable condition or situation to Airbnb and terminated the booking.

31.     No express contract arises between host and guest, and no money changes hands between host and guest. Rather, per the express Airbnb Terms of Service, the host makes a commitment to Airbnb to provide a guest with a limited license (not a lease) to enter and use the listing for the limited duration of the confirmed booking.

32.     Even after a particular booking is confirmed, both the host and the guest have the ability to cancel or modify such booking and in some cases receive a full refund.

33.     A host receives a payout upon satisfaction of the host's commitment to Airbnb to fulfill the host's obligations to reserve the space for the guest on the dates

requested and to otherwise provide satisfactory hospitality to the guest.

34.     Thus, while the economic transactions and the social transaction are clearly related insofar as the economic transactions are contingent upon a successful social interaction, platforms such as Airbnb serve to facilitate this social interaction.

## B. Chicago's Shared Housing Ordinance

### 1. An Overview

35.     On June 22, 2016, the Chicago City Council passed an ordinance amending Titles 2, 3, 4 and 17 of the Municipal Code regarding Shared Housing Units and Vacation rentals (the "Shared Housing Ordinance"). Shortly after passage, the Chicago Tribune described the new law as "dizzyingly complex."[1]

36.     A true and correct copy of this new ordinance, referred to herein as the "Shared Housing Ordinance," is attached hereto as *Exhibit 1*.

37.     By its express terms, the Shared Housing Ordinance takes full effect "150 days following its passage and publication."   Upon information and belief, this law was "published" in the Journal of Proceedings for the City Council on or around July 20, 2016, and therefore the law takes full effect on or about December 19, 2016.

### 2. The City Created a New Registration Power for Itself.

---

[1]  John Byrne, "Airbnb rules easily pass Chicago City Council despite vocal opposition," Chicago Tribune, June 22, 2016, available at http://www.chicagotribune.com/news/local/politics/ct-chicago-city-council-airbnb-rules-met-20160622-story.html (last viewed Oct. 29, 2016).

38.     The Shared Housing Ordinance creates a new "registration" power for the City, which is a power of general applicability, and specifically applies it to previously anonymous activity on the internet.   SHO, § 2-25-050(b)(10).

39.     With the power to register comes the power to suspend or revoke registration, and thereby to ban or control the activity.

40.     The registration required by the City under the Shared Housing Ordinance is a pre-requisite to the ability of a person to put up and maintain a listing of a "Shared Housing Unit" on internet platforms such as Airbnb.

**3.   The New Law Is Incomprehensible**

41.     Under the Shared Housing Ordinance, the City apparently contemplates that all hosts participating in internet home sharing should either register as a "Shared Housing Unit" or license as a "Vacation Rental."

42.     However, the definitions of "vacation rental" and "shared housing unit" are functionally indistinguishable. The term "vacation rental" is defined as "a dwelling unit that contains 6 or fewer sleeping rooms that are available for rent or for hire for transient occupancy by guests."   SHO, §4-6-300(a). The term "Shared Housing Unit" is defined as "a dwelling unit containing 6 or fewer sleeping rooms that is rented, or any portion therein is rented, for transient occupancy by guests." SHO, §4-14-010.

43.     Each definition of "vacation rental" and "shared housing unit" excludes "guest suites."   SHO, §4-6-300(a); 4-14-010.   A "guest suite" is defined as "a dwelling unit

that is available for rent or for hire for transient occupancy solely by the guests or family members of residents of the building which contains the dwelling unit, and is not offered, advertised or made available for rent or hire to members of the general public."   SHO, §4-6-300(a).

44.     Under this definition of "guest suite," a host using Airbnb who has the "Insta-Booking" function turned off, and who is selective about which guests to invite to stay at his or her listing, is operating a "guest suite" that is not subject to regulation under the Shared Housing Ordinance, because the dwelling unit is not being offered, advertised or made available for rent or hire to members of the general public.

45.     The City Council did not explain how the City should distinguish between "guests … of the resident" and "members of the general public," nor is it possible to explain such a distinction because all "guests … of the resident" are by definition also "members of the general public."

46.     The Shared Housing Unit creates two separate regulatory regimes for platforms such as Airbnb.   The Shared Housing Ordinance regulates both "intermediaries" (presumably, such as Airbnb) [2] and "advertising platforms"

---

[2] An "intermediary" is defined as "any person who, for compensation or a fee: (1) uses a platform to connect guests with a short term residential rental provider for the purpose of renting a short term residential rental, and (2) primarily lists shared housing units on its platform."   SHO, § 4-13-100.

(presumably, such as TripAdvisor or VRBO)[3] in similar but distinct ways.

47.     Unlike "Advertising Platforms," "Intermediaries" are required by the City to make mandatory reports and disclosures to the City about each of its registered hosts, including their name, address, and transaction history, without having to first obtain a search warrant or a court order and without the consent of the host.

48.     Further, "intermediaries" are deputized by the City to educate their members as to the new rules and affirmatively police their own listings. *See* SHO, § 4-13-215; 4-13-220(e), (f) and (h).

49.     Additionally, unlike "Advertising Platforms," each "intermediary" is required to "bulk register" its hosts with the City "on behalf of the owner or tenant" – regardless of whether the host consents to such "bulk registration" and disclosure of the host's personal information to the City, without notice to the host that such disclosure is being made, and even if such host has chosen to alternatively license as a "vacation rental" or "bed-and-breakfast."   SHO, § 4-13-230(a).

50.     Whether a platform such as Airbnb or VRBO (or a new platform) is an

---

[3] An "advertising platform" is defined as "any person who, for compensation or a fee: (1) uses a platform to connect guests with a short term residential rental provider for the purpose of renting a short term residential rental, and (2) primarily lists licensed bed-and-breakfast establishments, vacation rentals or hotels on its platform or dwelling units that require a license under this Code to engage in the business in the business of short term residential rental." SHO, § 4-13-100.

"intermediary" or "advertising platform" is itself indeterminate because it depends on whether the platform "primarily" serves as a platform for hosts of "shared housing units" or for licensees of "vacation rentals." Thus, if in Year 1, a platform such as Airbnb obtains a license as an "intermediary," it may be required or allowed in a later year to obtain a separate license as an "advertising platform" based solely on a shift in the registration and/or licensing patterns of the majority of its users.

51. The City Council does not define what it means for a website or platform to "primarily" list "shared housing units" or "vacation rentals" on its website, which is an indeterminacy that is further compounded by the virtually identical definitions of "shared housing unit" and "vacation rental" in the law.

**4. The Shared Housing Ordinance Does Not Just Regulate Home Sharing; In Many Cases It Operates As An Outright Ban.**

52. The Shared Housing Ordinance operates as an outright ban on Airbnb activity for certain homeowners and renters in Chicago.

53. In Section 4-13-270(c) of the Shared Housing Ordinance, the City has the duty to maintain a "prohibited buildings list," identifying the addresses of all buildings whose owners, including a homeowners' association or board of directors, have notified the City that no vacation rentals or shared housing units are permitted to operate.

54. The notification to the City of this intent may be made by an agent for the homeowner's association, such as a property manager, or by a single board member.

55.    There is no requirement that the unit owners in a condominium or homeowner's association be informed that their building is being placed on the "prohibited buildings list.'

56.    There is no requirement that a vote be held by the homeowner's association or condominium board to authorize the placement of the building onto the City's prohibited buildings list.

57.    There is no requirement that the determination by the homeowner's association, condominium board, or one of its directors or agents be correct that the bylaws and declaration prohibit the operation of vacation rentals and/or shared housing units.

58.    There is no requirement that an amendment to the condominium instruments be passed pursuant to the bylaws if the bylaws and/or Declaration currently allow vacation rental and/or shared housing unit activity.

59.    Rather, even where such activity is legally allowed and part of the title purchased by a homeowner, a single member of a condominium association, or even a single property manager, could submit a notification to the City to place the building on the "prohibited buildings list," and thereby divest all unit owners of their rights to participate in home sharing on internet sites such as Airbnb.

60.    Further, the consequence of having one's building placed on a prohibited building's list is not that booking transactions are disallowed. Rather, the consequence is that a unit owner cannot maintain a listing at all for that building – even if the unit owner

simply wanted to retain the ability for others to view his or her many positive reviews or see pictures of his or her unit.

61.     Failure to remove a listing for a dwelling unit in a building placed on a prohibited buildings list can subject the unit owner to fines of up to $3,000 per day the listing is online – even if the unit owner never received any notice that the building had been placed on the "prohibited buildings list," and even if the condominium instruments allow such activity.

62.     The "prohibited buildings list" provision not only empowers individual members or agents of a homeowner or condominium association to arbitrarily and without notice divest unit owners of their rights, but it also shifts the burden and expense of enforcing purported condominium rules from the local community to the taxpayers in general.

63.     Additionally, the "prohibited building list" provision empowers landlords to change the terms of their contractual leases with their tenants, insofar as the landlord and tenant did not affirmatively negotiate and agree to a specific ban on Airbnb and other related home sharing activity.  By simply notifying the City that a building should be placed on the "prohibited buildings list," a landlord could rewrite the rental agreement to ban home sharing activity, without providing the tenant any consideration.  Further, as with homeowners' associations, the landlord would then shift the costs of monitoring and enforcement of the private, contractual lease terms from himself or herself to the taxpayers

in general.

64.     The Shared Housing Ordinance also creates "maximum caps" on the number of listings – not active bookings, but merely internet listings – that can be online on any internet platform at any one time, depending on the type of building.   For two-to-four dwelling unit buildings, the new law limits the number of permissible listings to one – only one owner or tenant may maintain a listing on a home sharing internet platform at any time, and the second owner or tenant who wishes to so list his or her home may not create or maintain such a listing.   For buildings with five or more dwelling units, the "maximum cap" is 25 percent of the total number of units, or a maximum of six, internet listings that can be online at any one time.    Thus, the seventh homeowner or renter in a large high-rise building is banned from not only sharing his or her home with guests but from maintaining a listing on the internet for that possibility.

65.     The Shared Housing Ordinance also divests completely innocent third parties from their rights to use home sharing services, even if they were not the licensee or registrant deemed ineligible by a violation of the Shared Housing Ordinance.   Section 4-14-090(d) states that "[i]f a shared housing unit registration under this chapter is revoked, such revocation shall remain in effect for a period of at least two years from the date of revocation and thereafter until such time as a new owner or tenant, as applicable, other than a family member of the person whose registration was revoked, occupies the dwelling unit."

66.     Similarly, Section 4-14-050(i), for instance, states: "Following notice of a final

determination of ineligibility under Section 4-14-030(b), it shall be unlawful for any shared

housing host to rent or to allow any family members to rent any shared housing unit

identified in such notice that the commissioner has determined is ineligible for listing on

any platform."

67.     Thus, a family member of a unit owner whose "shared housing unit"

registration is revoked could not sublease the unit and attempt to register his or her own

Airbnb listing for this two-year period, even if the family member is completely innocent of

the violations that led to the revocation of the registration.

   **5.  The Shared Housing Ordinance Requires Disclosures By Chicagoans Who
       Never Intend To Use Services Like Airbnb, And/Or Who May Not Even Have
       Heard Of Airbnb.**

68.     The Shared Housing Ordinance requires new disclosures for all property

owners and their real estate brokers wishing to sell or lease their home or unit, even if such

property owners are unaware of what Airbnb or other internet home sharing sites are, and

even if such property owners have no intention of ever listing their home on or using sites

such as Airbnb.

69.     Section 4-6-300(f)(13) of the Shared Housing Ordinance states:

(13) Disclosure and acknowledgement – Required

(1)   A building or dwelling unit owner, or agent thereof, shall not execute an
oral or written lease, contract to lease, or accept any money or other valuable
consideration in an application for an oral or written lease for a dwelling unit
without disclosing to the tenant or applicant in written form if the building or
dwelling unit owner knows that:

(i)     The dwelling unit being leased is licensed by the City of Chicago as a vacation rental;

(ii)    The dwelling unit being leased is ineligible under Section 4-13-260(a) to be rented as a shared housing unit or vacation rental.

(2) The tenant or applicant shall be required to execute a receipt acknowledging that these written disclosures have been made.

(3)   All owners of residential dwelling units and buildings (and their agents) shall, at the time of any offering for sale of said residential dwelling units and buildings, or in the case where improved real property is held under trust the sale of real property which forms the corpus of the trust or the transfer of the beneficial interest in such property, including contract sale, be required to disclose to the purchaser or prospective purchaser if the owner knows:

(i)     The dwelling unit being leased is licensed by the City of Chicago as a vacation rental;

(ii)    The dwelling unit being leased is ineligible under Section 4-13-260(a) to be rented as a shared housing unit or vacation rental.

(2) The purchaser or prospective purchaser shall be required to execute a receipt acknowledging that these written disclosures have been made.

70.     A substantially similar provision exists in the "Shared Housing Unit" section of the Shared Housing Ordinance at Section 4-14-040(d).

71.     Because a unit or house can be placed deemed to be ineligible under the Shared Housing Ordinance by a misinformed property manager or condominium board director or simply by the Airbnb activity of other neighbors, a property owner (especially of a condominium unit) or his or her real estate agent could be found to have made a material omission in the course of a lease or sale, and thereby be found to be liable simply

for not obtaining a written receipt from the tenant or prospective purchaser about a disclosure that property owner or agent had no reason to think needed to be made.

**6. The Shared Housing Ordinance Places Impossible Burdens On Hosts.**

72.     If an individual host elects to register as a "Shared Housing Unit" (or is involuntarily or incorrectly "bulk registered" as a "Shared Housing Unit" by an "intermediary"), such host is required to make certain mandatory disclosures, such as name, address, building information and contact information, and also provide "any other information that the commissioner may reasonably require in connection with the issuance or renewal of a registration under this chapter," as a pre-requisite to obtaining a registration number, which the host is then required to place inside his or her listing. SHO, § 4-14-020(b).

73.     Additionally, a person who elects to register as a "shared housing unit" host must submit an attestation that "the host has reviewed and understood the requirements of this ordinance." SHO, § 4-14-020(c)(1); § 4-13-215.   The Shared Housing Ordinance also provides that "[t]he attestation required under this subsection (c) shall be deemed an attestation to the city within the meaning of the False Statements Ordinance, Chapter 1-21 of this Code, regardless of the method by which such attestation is submitted or transmitted to the department." SHO, § 4-14-020(c)(2).

74.     Neither the City of Chicago nor Airbnb (or any other "intermediary") has offered to pay for or otherwise made arrangements for hosts and Chicagoans to have

independent legal counsel to advise them as to how the Shared Housing Ordinance applies to them.

75.     The City of Chicago has offered to hold classes for interested hosts, where the City would be providing legal advice to hosts without disclosing the City of Chicago's conflict of interest to such hosts.

76.     If a person refuses to sign or agree to such an attestation, the Intermediary is barred from allowing such a person to list on the website and such person is ineligible to register as a Shared Housing Host.

77.     Each person who elects to register as a "shared housing host" must perform a "zoning review, as provided by the commissioner in rules, to ensure that the location of the shared housing unit is in compliance with the Chicago Zoning Ordinance." SHO, § 4-14-020(d)(1).

78.     Additionally, each person who elects to register as a "shared housing host" must also perform a review of the City's "prohibited building list … to ensure that the shared housing unit is not located at an address identified on that list." SHO, § 4-14-020(d)(2).

79.     Each person who elects to register as a "shared housing host" must also perform a review of the "restricted residential zone list" to "ensure that the shared housing unit is not located in a restricted residential zone."   SHO, § 4-14-020(d)(3).

80.     The Commissioner assigns a unique "registration number" to "each

approved shared housing unit registered with the department." SHO, § 4-14-020(e).

81.     Each person who is assigned such a registration number has a duty to "promptly post the registration number in a conspicuous place in all applicable listings on any platform." SHO, § 4-14-020(f).

82.     The registration of a shared housing unit is "non-transferable." SHO, § 4-14-020(i).

83.     Failure to list a registration number in a listing "shall create a rebuttable presumption that the shared housing unit is being operated without the proper registration." SHO, § 4-14-040(b)(4).

84.     Any person who fails to list such a registration number in his or her listing is at risk of being deemed ineligible to be a "shared housing host" and is further subject to fines of "not less than $1,500 nor more than $3,000.00 for each offense" where "[e]ach day that a violation continues shall constitute a separate and distinct offense." SHO, § 4-14-090(a).

85.     If a person elects to be a "shared housing unit" host, such shared housing unit "shall be deemed to be a public accommodation within the meaning of Section 2-160-070" which is the Chicago Human Rights Ordinance.

86.     The Shared Housing Ordinance states that "[i]t shall be unlawful for any person that owns, leases, rents, operates, manages or in any manner controls such public accommodation to withhold, deny, curtail, limit or discriminate concerning the full use

of such public accommodation by any individual because of the individual's race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status or source of income in violation of Section 2-160-070." SHO, § 4-14-040(c).

87.     Thus, a woman who prefers to host only female Airbnb guests will now be in violation of the Chicago Human Rights ordinance if she elects to register as a "shared housing unit," and even if she rents to a man, she would also be in violation of this provision if she refuses to let this man sleep in her bed or enter into her bedroom or her private bathroom ("full use of such public accommodation").

88.     The Shared Housing Ordinance enumerates several specific "operating requirements" for any person who elects to register as a "shared housing unit" host. SHO, § 4-14-040(b).    Among other requirements, such registrant must:

A. ***Sanitize Dishes, Pots, Pans and Utensils*** – all dishes, utensils, pots, pans and other cooking utensils must be "clean[ed] and sanitize[d]" between guests, and any food, beverages and alcohol must be disposed of if left behind by guests.

B. ***"Snitch" Law*** – each host must "immediately notify and cooperate with the police department if the shared housing host knows or suspects that any criminal activity, egregious condition or public nuisance is taking place in the shared housing unit."

C. ***Posting Contact Information and Evacuation Diagram*** – the real name and phone number of a "local contact person" and an "evacuation diagram identifying all means of egress from the shared housing unit and the building in which it is located" must be posted "in a conspicuous place near the entrance of the shared housing unit."

D. *Food Handling Safety* – "Each shared housing host that provides food to guests shall comply with all applicable food handling and licensing requirements of this code and board of health regulations." The reference to "food handling and licensing requirements" is a reference to the 68-page "Food Code" for commercial kitchens established by the Chicago Department of Health.

E. *Maintenance of Records* – each registered host must keep, for 3 years, records of all guests, including (i) name, (ii) contact information, (iii) signature and (iv) dates of accommodation. Each host is also required to make these registry records available for inspection to "any authorized city official … upon request."

89.    In addition to the mandatory "operating requirements," the Shared Housing Ordinance enumerates several "unlawful acts" that are now prohibited and subject to fines of up to $5,000.   SHO, § 4-14-050.   For example:

A. **Criminal Activity, Nuisances, Egregious Conditions** – if a shared housing host "permit[s]" any criminal activity, public nuisance or egregious condition, such registered host is liable to a fine "of not less than $2,500.00 nor more than $5,000.00 for each offense" where "[e]ach day that a violation continues constitutes a separate and distinct offense."

B. **Misrepresentation of Material Facts** – if any shared housing host misrepresents any material fact regarding the shared housing unit in a listing, that is unlawful.

C. **Service of Alcohol – Prohibited** – it is unlawful for any shared housing host to "serve or otherwise provide alcohol to any guest or invitee of any guest."

D. **Violation of Condominium or Cooperative Building Restrictions** – this provision makes it unlawful to list a unit on the internet or to rent a shared housing unit if the HOA has "adopted by-laws prohibiting the use of the dwelling unit as a shared housing unit or vacation rental, in any combination."

E.  **Violation of Rental Restrictions –** it is unlawful for a person who elects to register as a "shared housing host" to list a unit that is subject to a lease restriction.

F.  **Not Primary Residence – Single Family Home** – it is unlawful to list a single family home that is not the "primary residence" of a shared housing host, unless the host in on active military duty, unless the Commissioner has granted an adjustment or unless it was previously licensed as a vacation rental as of June 22, 2016.

G.  **Not Primary Residence – Two to Four Dwelling Units** – it is unlawful for a person to list a unit on any "platform" or to rent a shared housing unit that is located in a building with two to four dwelling units, unless the unit is (1) the shared housing host's primary residence, and (2) is the <u>only</u> dwelling unit that is or will be used as a shared housing unit or vacation rental, unless the owner is on active military duty, has obtained a Commissioner's adjustment or was previously licensed as a vacation rental.

H.  **High Rise Maximum Cap** – for buildings with five or more dwelling units, it is unlawful to list or rent a shared housing unit where "more than six dwelling units in the building, or one-quarter of the total dwelling units in the building, whichever is less, are or will be used as shared housing units or vacation rentals," absent a Commissioner's Adjustment**.**

I.  **Failure to Remove Listing** – it is unlawful for a host to fail to remove a listing from the internet if the Commissioner has made a final determination of ineligibility

90.    A registration as a "Shared Housing Unit" (or a license as a "vacation rental") may be revoked by the Commissioner for the Department of Business and Consumer Affairs for the following enumerated reasons:

A.  *Situs of one or more egregious conditions* - among an obvious "parade of horribles," an "egregious condition" is also defined as including "the use of a shared housing unit by a guest for commercial purposes, including, but

not limited to, holding out the unit to members of the general public as the location of a party, amusement, or event."

B. *Situs of three or more "objectionable conditions"* – for the purpose of this section, "objectionable conditions" include, *inter alia*, "excessively loud noise" which is defined as "any noise, generated from within or having a nexus to the rental of a shared housing unit, between 8:00 P.M. and 8:00 A.M., that is louder than the average conversational level at a distance of 100 feet or more, measured from the property line of the shared housing unit."

C. *Situs of three or more "nuisance conditions"* – measured during a 12-month period, and including outside of the boundaries of a shared housing unit or vacation rental (including the parking facility, the premises generally or "on adjacent property." In a post-deprivation hearing, this "nuisance condition" may be proved with "any evidence on which a reasonably prudent person would rely … without regard to the formal or technical rules of evidence."

D. *Scofflaw or Problem Landlord* – again, this could be a building problem, not a shared housing unit host problem.

E. *Threat to public health, safety or welfare* – this is confusing because the first element for immediate suspension or revocation of a registration is the Commissioner's good cause to believe in an "imminent threat to public health, safety or welfare." This particular second element allows the Commissioner to suspend or revoke a registration solely upon that "good cause to believe" in the first prong.

F. *Unlawful discrimination* – any finding that a host declined a guest for discriminatory reasons is grounds for revocation of the right of the host to list an advertisement on an intermediary platform.

91. Findings of violations of any of the foregoing could result in fines of $3,000 per day per violation.

92. Section 4-14-100 authorizes the Commissioner to grant an adjustment to

allow the operation of a shared housing unit in (i) a single family home or a unit in a two-to-four dwelling unit building that is not the shared housing host's primary residence or (ii) in a building containing two-to-four dwelling units, an increase in the number of dwelling units that may be used as shared housing units.

93.    In order to allow such an adjustment, the Commissioner must find that such an adjustment is necessary to "eliminate an extraordinary burden on the applicant in light of unique or unusual circumstances and would not detrimentally impact the health, safety or general welfare of surrounding property owners or the general public."

94.    Enumerated factors that the Commissioner "may consider" with respect to an application for an adjustment include:

A.    "the relevant geography"

B.    "the relevant population density"

C.    "the degree to which the sought adjustment varies from the prevailing limitations"

D.    "the size of the relevant building and the number of units contemplated for proposed use"

E.    "the legal nature and history of the applicant"

F.    "the measures the applicant proposes to implement and maintain quiet and security"

G.    "any extraordinary economic hardship to the applicant, due to special circumstances, that would result from a denial"

H.    "any police reports or other records of illegal activity or municipal code

violations at the location" (note: not convictions – complaints) and

I.      "whether the affected neighbors support or object to the proposed use."

SHO, § 4-14-100(a).

95.      Additionally, upon a written request for an adjustment, the Commissioner "shall notify the affected alderman and solicit a recommendation based on the alderman's analysis of the relevant factors, and may seek additional information or supplementary proof from the applicant, and may also solicit information from the community." SHO, § 4-14-100(c).

96.      The "commissioner's adjustment" provision of the Shared Housing Ordinance is an invitation for graft, favoritism and discriminatory treatment towards political opponents, disfavored persons or non-supporters of particular aldermen. The enumerated standards that the Commissioner "may consider" are purely discretionary and extraordinarily broad such that virtually any favored request for an adjustment could be admitted, and any disfavored request for an adjustment could be denied, using the enumerated language. Coupled with the mandate that the Commissioner must "solicit a recommendation" from the local alderman, Chicagoans' rights to share their home with their own guests is subject to the whims of the local alderman, whose input will likely have inordinate weight with the Commissioner. To put it bluntly, the new Shared Housing Ordinance turns Chicago's citizens into serfs, and transforms our neighborhoods into tiny aldermanic fiefdoms.

### 7. The Vacation Rental Licensing Changes Are Also Burdensome And Impracticable.

97.     With respect to "vacation rentals," a host who elects to obtain a license as a "vacation rental" must submit an application that is similar to the application to register as a "Shared Housing Unit," but that also contains additional sworn attestations, including attestations that (in a two-to-four dwelling unit building) that the licensed unit "is the only dwelling unit that ***is or will be used*** as a vacation rental or shared housing unit" or (for buildings containing five or more dwelling units) that "no more than six dwelling units in the building, or one-quarter of the total dwelling units in the building, whichever is less, ***are or will be used*** as vacation rentals or shared housing units, in any combination." (Emphasis added).

98.     It is unlikely that the average person would know what his or her neighbors are doing with their units, given the many different home sharing internet rental platforms available out there, and it is virtually impossible for a person to predict the future actions or intentions of one's neighbors, to the extent such person has multiple neighbors that are not immediate friends or family.

99.     Additionally, as a prerequisite to obtaining a "vacation rental" license, a host must obtain commercial general liability insurance of up to $1 million that names the City of Chicago as an additional insured – even if the host books guests through Airbnb (which has its own $1 million guarantee).

100.    Upon information and belief, there are presently no commercially available insurance products in the Chicago market that offer a CGL policy for shared housing situations where the host lives in the unit with the guest.

101.    Further, with respect to "vacation rentals," the Shared Housing Unit authorizes the Chicago Building Commissioner to "mandate an inspection of any vacation rental, at any time and in any manner, including third-party reviews, as provided for in rules promulgated by the building commissioner."   The law also states that "[i]f the licensee provides food to his guests in the vacation rental, the board of health may inspect the vacation rental in accordance with rules promulgated by the board of health." SHO, 4-6-300(e).

### 8.  The Shared Housing Ordinance Contains Hair-Trigger Rules That Make Violations Unavoidable.

102.    The Shared Housing Ordinance also empowers neighbors of a property owner to ban home sharing activity as a "shared housing unit" or a "vacation rental." In a condominium association, an agent of the Condominium Association (including, for example, a property manager) is empowered to submit a statement to the City of Chicago attesting that home sharing activity is prohibited by the Condominium Association, even if there was never a vote to amend the bylaws or the Declaration or to submit such a statement.

103.    Additionally, because "excessive loud noise" is defined in a way that any

noise that is reportedly audible after 8:00 p.m. and has some "nexus" to home sharing activity could result in suspension or revocation of a registration or license, the law empowers neighbors to specifically target and harass property owners who are suspected of hosting guests in their own home that they met through the internet.

104. Further, the "maximum caps" for two-to-four dwelling unit buildings and for buildings with five or more dwelling units could be triggered by a neighbor or a small group of neighbors who dislike the idea of a property owner's home sharing activities to create fake "listings" on the same site as the legally registered or licensed listing, such that the "maximum caps" are intentionally breached and all listings in that building are therefore deemed to be illegal.

**CLASS ACTION ALLEGATIONS**

105. Plaintiffs incorporate their allegations in paragraphs 1 through 104 as if fully stated herein.

106. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Wolf brings this action as a class action and seeks certification of the claims and certain issues in this action on behalf of a Class defined as:

**Subclass 1:   Hosts**
**All Chicago residents who (A) own or lease property in the City of Chicago and (B) (i) who list their property or a room in their property on the internet through platforms such as Airbnb, VRBO, TripAdvisor, HomeAway, Flipkey, and other online platforms or intermediaries used primarily to facilitate "home sharing," for transient occupancy in exchange for consideration, or (ii) who wish to so list their property on such internet sites**

or platforms in the future.

**Subclass 2:    Guests**
**All persons what have ever been a guest of a Chicago resident who owns or leases property in the City of Chicago and who has listed his or her property or a room in such property on the on the internet through platforms such as Airbnb, VRBO, TripAdvisor, HomeAway, Flipkey, and other online platforms or intermediaries used primarily to facilitate "home sharing,", for transient occupancy in exchange for consideration**

107.    Plaintiffs reserve the right to amend this Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.   Excluded from the Class are Defendant, any aldermen on the City Council, governmental entities, public bodies, any of Defendant's departments or agencies, and any officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns of any of Defendants' departments, agencies or public bodies.   Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

108.    The class of past, present and future hosts on Airbnb and other home sharing internet sites is so numerous, and the identities of such persons is hidden anonymously, such that joinder of all members of the Class and any subclass is impracticable.

109.    The questions of law and fact raised herein are common to all members of the Class and any subclass, as all members of the Class and any subclass are subject to being similarly affected by constitutional infirmities of the Shared Housing Ordinance as

presently drafted.

110. The claims and defenses of Plaintiff Wolf are typical of the claims or defenses of the Class.

111. Plaintiffs will fairly and adequately protect the interests of the Class.

112. Prosecuting separate actions by or against individual class members will create the risk of inconsistent and varying adjudications and would establish incompatible standards of conduct for Defendant.

113. Additionally, adjudications of the constitutionality of the Shared Housing Ordinance with respect to individual class members will, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

114. Plaintiff Keep Chicago Livable issued a letter to all 50 aldermen on the Chicago City Council, as well as to the Mayor of Chicago, highlighting the various constitutional and practical infirmities with the Shared Housing Ordinance identified herein, and requested a meeting to discuss these concerns. A true and correct copy of the open letter sent on September 15, 2016 is attached hereto as *Exhibit 2*. Plaintiffs received no substantive response to this letter.

115. Accordingly, the City has refused to act on grounds that apply generally to the class to fix this defective law, such that injunctive relief and/or declaratory relief is appropriate with respect to the class as a whole.

116.    The common questions of law and fact as to how Airbnb works and whether the Shared Housing Ordinance is constitutional or not predominate over any questions affecting only individual members, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I

## DECLARATORY JUDGMENT
## FIRST AMENDMENT – PRIOR RESTRAINT ON FREE SPEECH

117.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

118.    The First Amendment to the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech, or of the press."   The prohibitions in the First Amendment have been applied to states and localities through the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and under the "incorporation doctrine."

119.    It is well-settled that prior restraints on non-commercial speech are typically unconstitutional, with some very narrow and inapplicable exceptions.

120.    Even prior restraints on commercial speech are only permissible if subject to procedural safeguards, which are absent here.

121.    The pre-registration requirement for Shared Housing Units is an impermissible prior restraint on free speech, regardless of whether a particular listing is

deemed to be "commercial speech" or not.

122.    Prior to the Shared Housing Ordinance, Section 2-25-050 of the Chicago Municipal Code defined the general powers and duties of the Department of Business Affairs and Consumer Protection (the "DBACP") as including the creation and enforcement of a licensing regime for businesses operating in the City of Chicago.

123.    The Shared Housing Ordinance amends Section 2-25-050(b)(10) to create a brand new power for the DBACP:   the power to require citizens to register with the City, and also to suspend registrations, regardless of whether such persons were engaged in a trade or business.

124.    The Shared Housing Ordinance operates in substantial part by requiring all persons who wish to post and maintain a listing for a "Shared Housing Unit" to first register and obtain a registration number, where such registration includes disclosure to the City of the person's identifying information and subjects such registrant to a host of restrictions and rules, including a commitment to serve as a "public accommodation" for anyone interested in being a guest in the person's private home.

125.    Absent such registration, the Shared Housing Ordinance empowers the City to order that a listing for a "Shared Housing Unit" be removed and to subject a person with such a listing to daily fines of up to $3,000 per day that the listing remains on the internet.

126.    By creating a new registration power for itself independent from the pre-existing business licensing, the City is admitting that "Shared Housing Units" are not

commercial businesses in nature.

127.     By making registration a pre-requisite to posting and maintaining a listing for a "Shared Housing Unit" on sites such as Airbnb, the City is directly targeting and creating a prior restraint on non-commercial speech, and thereby limiting a fully protected social interaction between host and guest by conflating and confusing that interaction with the parallel economic transactions between the host/guest and Airbnb.

128.     The primary purpose for many hosts on platforms such as Airbnb is not necessarily to obtain a profit. Hosts enjoy sharing their homes with guests for many reasons that have nothing to do with making a profit, such as making new friends, learning about different cultures, showing off one's home and city to a newcomer or simply out of empathy for a traveler who could not otherwise afford to stay in a downtown hotel.

129.     Further, the mere posting of a listing by a host does not propose a commercial transaction. Rather, it describes the space and the host, and invites fellow members to make an offer at or below the suggested price.

130.     For many hosts, the motivation behind setting a suggested price in their Airbnb listings is as much customary and social as it may be economic:   it is customary for a guest to offer to compensate a host sharing his or her home with some form of gratuitous payment or consideration.   To put it another way, it would be considered rude or inconsiderate in most if not all cultures (including Chicago) for a guest that is not immediate family or a close friend to enjoy a host's hospitality for an extended period of time and to

not offer some form or amount of compensation for the inconvenience.

131. Further, the suggested price serves the social function of defining up-front what a host thinks would be an "inconsiderate" gratuity for a guest's imposition and enjoyment of hospitality, which helps avoid a possible misunderstanding at the end of the stay that might create hard feelings.

132. In this sense, the motivation behind suggesting a nightly rate in the listing is akin to two relative strangers on a dinner date agreeing to split the bill or "go Dutch" before meeting, to reduce the risk and cost involved with the arrangement, to avoid an awkward end-of-dinner conversation, and thereby to facilitate a smooth, enjoyable interaction during the dinner and possibly thereafter.

133. There are many non-commercial reasons that a person might create a host listing, other than for the purpose of generating nightly income or proposing a commercial transaction. Airbnb provides a simple platform for a person to post pictures of and information about their space (and Airbnb even provides a free professional photographer), and Airbnb provides market data, in the form of suggestions as to pricing recommendations that are variable according to the season, neighborhood and demand. Thus, a person interested in renting out their home long-term as a furnished rental could use their Airbnb listing as a convenient way to market to potential long-term tenants, or to learn market data about demand for their neighborhood.

134. Additionally, an active "host listing" can serve as valuable reputational

currency for a person who intends on using Airbnb as a guest, because hosts typically like to provide hospitality to other fellow hosts, especially those who are well-reviewed.

135. There are also many non-commercial reasons that a person might browse Airbnb listings, without intending to actually book a room as a guest. For example, a visitor to a new city could focus on particular neighborhoods and view actual homes in that neighborhood to get information about market prices, local hotspots, and even to glean aesthetic design or lifestyle information.

136. Thus, it is overly simplistic and incorrect to assume that the mere posting of a listing on the internet is the *sine qua non* of operating a commercial business or proposing a commercial transaction, or that such a listing is motivated solely or even primarily for economic reasons.

137. The registration requirement for "Shared Housing Units" under the Shared Housing Ordinance censors, chills and penalizes a significant amount of primarily noncommercial speech, denies a free exchange of information to consumers of information, and is not narrowly tailored to advance a compelling State interest.

138. Further, there are no procedural safeguards to ensure that the registration requirement or penalties associated with not registering as a "Shared Housing Unit" will not censor, chill or penalize non-commercial speech. To the contrary, the Shared Housing Ordinance requires that a third-party intermediary, such as Airbnb, "bulk register" all listings with the City "on behalf of" the host – regardless of whether or not the host consents

to being included in such "bulk registration," without notice to the host or any opportunity to object or be heard, and even if the host has taken other measures, such as licensing as a "vacation rental" or qualifies under an exception to the law.

139.    While the direct issue in this case involves Airbnb or home sharing on the internet, the power created by the Shared Housing Ordinance is of general applicability, and the target of this registration power strikes at the very heart of modern public discourse: the ability to communicate anonymously on the internet without government intermediation or permission. The City's purpose in enacting this registration requirement is to bring Airbnb hosts out of the shadows and make them disclose all of their personal information to the Government, as a precondition to their speech activity.   Even if some aspect of this speech activity could be characterized as commercial speech, a substantial portion of this speech activity is non-commercial speech.

140.    Given that municipalities around the United States and even worldwide are enacting restrictions and laws targeting Airbnb activity, there is a political component to the speech being targeted by the Shared Housing Ordinance:   members of nonprofit organizations such as Keep Chicago Livable use Airbnb bookings and their credibility as Airbnb "Superhosts" as a means to organize politically to both understand these laws, seek to educate lawmakers as to possible reforms or changes, and to organize to prevent new laws from being enacted that infringe on fundamental rights. Airbnb hosting and home sharing also serves as a demonstration to a skeptical general public that Airbnb guests are

peaceable, law-abiding, beneficial to local businesses and citizens, and not an existential threat to local communities.

141.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.  KEEP CHICAGO LIVABLE is unable to perform its function of educating and advising hosts and putative hosts as to their proper rights and duties under this new law, while the aforementioned constitutional questions remain unresolved.   This injury can be redressed by the requested relief of a declaratory judgment.

142.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.  Mr. Wolf and other present and future hosts that are similarly situated members of the CLASS are unable to know how and to what extent they are required to comply with the aforementioned provisions of the Shared Housing Ordinance, while the aforementioned constitutional questions remain unresolved.   This injury can be redressed by the requested relief of a declaratory judgment.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF, individually and on behalf of those similarly situated to him, respectfully request

and pray for a declaratory judgment that (1) the provisions of the Shared Housing Ordinance pertaining to registration of Shared Housing Units, including but not limited to the amendments or changes to Sections 2-25050(b)(10), 4-6-180(a), 4-6-290(a) of the Chicago Municipal Code, and the relevant portions (or the entirety) of Chapters 4-13, 4-14 and 4-16 of the Shared Housing Ordinance, be deemed unconstitutional, stricken and deemed void and unenforceable *ab initio*, that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered.

## COUNT II

## DECLARATORY JUDGMENT
## FIRST AMENDMENT – COMPELLED SPEECH

143.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

144.     Even if the mere posting of a listing on Airbnb is deemed "commercial speech" such that the registration requirement is not prohibited as an unconstitutional prior restraint on free speech, the Shared Housing Ordinance violates the First Amendment right against abridgments of the Freedom of Speech because it compels speech that is nonfactual and/or controversial.

145.     The Shared Housing Ordinance contains numerous provisions that require

hosts to include information in their listing that has no consumer protection function and that requires a host to attest to non-factual opinions sanctioned by the Government.

146.    For example, the requirement that all listings contain license or registration numbers serves no substantial consumer protection function. The sole or primary purpose of the license number listing requirement is to reduce the administrative cost of enforcement for the City, which upon information and belief, will be using computer "trolling" software to identify listings that do not contain license numbers.

147.    Upon information and belief, the City has taken steps so that a consumer that sees a listing with a license number has no way to make a public records or FOIA request for relevant information about the registrant or licensee or the licensed unit related to that license number.

148.    This purported administrative change was apparently made after an initial outcry from hosts that the license number listing requirement would make their homes targets for "cat burglars" or otherwise subject them to harassment or crime, which also shows that the license number listing requirement was not "noncontroversial."

149.    This license number listing requirement is distinct from a requirement that businesses post their license at the point of sale, because a listing is not the terminal "point of sale" for an Airbnb transaction.   Rather, while listings can be viewed by anyone, the point of sale for an Airbnb transaction occurs after the guest and host meet in person.   An intermediary home sharing platform merely facilitates this in-person meeting, but the

transaction is for the most part not consummated and money is not transferred to the host until and unless the guest is satisfied with the actual accommodations.

150.    The requirement that "Shared Housing Unit" hosts and "vacation rental" licensees post, in a conspicuous place by the front of the dwelling unit, a sign containing the license or registration number, and the name and telephone number of the local contact person, is also impermissible compulsory speech because while it is factual, and is at the point of the actual transaction, it is not "non-controversial."   Such information subjects a host or the local contact person to the risk of identity theft – not necessarily by the guest, who would already have such information in the confirmation of the reservation, but from third party passerby's and other visitors who would be able to readily view such conspicuously posted information from just outside the entrance to the dwelling unit.

151.    In order for a person to register a "Shared Housing Unit," the Shared Housing Ordinance requires the applicant to sign an attestation that they have "read and understood" the entire 57-page Shared Housing Ordinance.

152.    This attestation requirement forces a person who most likely does not have legal training to not only render a legal opinion, but to do so in a manner that is apparently intended to waive such person's right to later claim that the law was incomprehensible. Especially with this "dizzyingly complex" and arguably incomprehensible law, this attestation requirement presents Shared Housing Unit hosts with an impermissible Hobson's Choice: either submit a false statement to the City in exchange for a registration,

or continue to operate without a registration number.

153.    The "Shared Housing Unit" registration also requires that a person who may not be sophisticated in real estate law investigate and attest that the unit is a lawfully established dwelling unit, is not subject to HOA or rental restrictions, is not impermissibly zoned, is not on a prohibited buildings list and is not contained within a restricted residential zone.   Each of these separate required statements each independently violate the compelled speech prohibition, because each of these attestations requires a person to render a legal opinion and subjects the applicant to sanction if incorrect.

154.    If a person wishes to license as a "vacation rental," there are other similarly impermissible attestation requirements.   An applicant for a "vacation rental" that lives in a two-to-four dwelling unit building must sign an attestation that (1) the applicant is the only person with a listing on any of the myriad internet home sharing sites or platforms and (2) that in the future, such applicant will be the only person to have such a listing on any of these sites.   Similarly, for a "vacation rental" license applicant who lives in a high-rise building, such applicant must attest to (1) what his or her neighbors are doing in terms of listing activity and (2) what his or her neighbors will do in the future.   These compulsory opinions are not only unconstitutional – they are impossible to make and thus entirely worthless, other than to put the applicant into a perjury trap.

155.    The Shared Housing Ordinance requires "Shared Housing Unit" registrants and "Vacation Rental" licensees to affirmatively report to and cooperate with the police if

they know or suspect that any criminal activity, "egregious condition" or public nuisance is taking place in or around the dwelling unit. This mandatory reporting and cooperation with police requirement is unconstitutional forced speech, especially because a requirement based on a mere suspicion of not only criminal activity, but of non-criminal activity that could possibly bother a neighbor, requires a person to render an opinion and then disclose it to the authorities, and to waive any right to privacy from the police.

156.    Further, because the Shared Housing Ordinance makes it unlawful for a host to permit any criminal activity, egregious condition or public nuisance to occur in a dwelling unit, and subjects the host to fines of up to $5,000 per offense, the mandatory reporting and cooperation requirement forces a host to confess to a civil penalty of up to $5,000 per offense, and thereby waive any right against self-incrimination.

157.    Such mandatory speech also endangers the host and the host's property in his or her home, because it forces a confrontation with a guest that involves the authorities.

158.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance. KEEP CHICAGO LIVABLE is unable to perform its function of educating and advising hosts and putative hosts as to their proper rights and duties under this new law, while the aforementioned constitutional questions remain unresolved. This injury can be redressed by the requested relief of a declaratory judgment.

159.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.   Mr. Wolf and other present and future hosts that are similarly situated members of the CLASS are unable to know how and to what extent they are required to comply with the aforementioned provisions of the Shared Housing Ordinance, while the aforementioned constitutional questions remain unresolved.   This injury can be redressed by the requested relief of a declaratory judgment

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF respectfully request and pray for a declaratory judgment that the following provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* in violation of the First Amendment:   Chicago Municipal Code Sections 4-6-290(a)(7), 4-6-290(a)(8)(i), 4-6-300(b)(5), 4-6-300(b)(6), 4-6-300(b)(7), 4-6-300(b)(9), 4-6-300(b)(10), 4-6-300(c)(10), 4-6-300(f)(4), 4-6-300(f)(7), 4-6-300(f)(8), 4-6-300(f)(10), 4-6-300(h)(1), 4-6-300(h)(3), 4-6-300(h)(9), 4-6-300(h)(10), 4-6-300(h)(11), 4-13-260(a), 4-14-020(a), 4-14-020(b)(6), 4-14-020(c)(1), 4-14-020(c)(2), 4-14-020(d), 4-14-020(f), 4-14-020(g), 4-14-020(h), 4-14-030(a), 4-14-040(a)(4), 4-14-040(b)(3), 4-14-040(b)(4), 4-14-040(b)(6), 4-14-040(b)(8), and 4-14-040(b)(9), and that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as

authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered.

## COUNT III

## DECLARATORY JUDGMENT
## FIRST AMENDMENT – CONTENT-BASED RESTRICTION

160.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

161.    The Shared Housing Ordinance specifically targets and is intended to regulate home sharing to the extent that the host and guest meeting on the internet on one of the private internet platforms or intermediaries.

162.    By discriminating against home sharing to the extent that it occurs on the internet, or to the extent that the regulations only apply to those who post listings on the internet for their dwelling units, the Shared Housing Ordinance is unconstitutional content-based discrimination under the First Amendment.

163.    The regulated speech does not concern an illegal activity, as it was always legal to share one's home with invited guests, and it is legal to post a listing on sites such as Airbnb.

164.    The Shared Housing Ordinance does not target misleading speech.

165.    The City of Chicago's interest in restricting home sharing on the internet is not substantial, and several provisions of the Shared Housing Ordinance do not directly

advance whatever government interest there is in such regulation.

166.     The Shared Housing Ordinance is not narrowly tailored to serve the City of Chicago's legitimate interests.

167.     Additionally, plaintiff KEEP CHICAGO LIVABLE is suffering the present and continuing injury of not being able to properly advise its host-members as to whether they may have an actionable takings claim for just compensation from the City of Chicago if and/or when the law takes effect, because there is a dispute about whether the Shared Housing Ordinance takes away a compensable property right under the Takings Clause.

168.     There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.   This injury can be redressed by the requested relief of a declaratory judgment.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF, individually and on behalf of those similarly situated to him, respectfully request and pray for a declaratory judgment that the aforementioned portions (or the entirety) of Chapters 4-13, 4-14 and 4-16 of the Shared Housing Ordinance, be deemed unconstitutional, stricken and deemed void and unenforceable *ab initio*, that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered.

## COUNT IV

## DECLARATORY JUDGMENT
## FOURTH AMENDMENT – UNREASONABLE SEARCHES AND SEIZURES

169.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

170.     The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

171.     The Fourth Amendment applies to the States and localities through the Fourteenth Amendment and the incorporation doctrine.

172.     In *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), the United States Supreme Court affirmed a facial challenge brought under the 4th Amendment by a group of hotel operators and upheld the striking down of a City of Los Angeles ordinance that required the operators to obtain and keep records about their guests and that such records "shall be made available to any officer of the Los Angeles Police Department for inspection … at a time and in a manner that minimizes any interference with the operation of the business."

173.     The Shared Housing Ordinance requires that for either "Shared Housing

Units" and "Vacation Rentals," the host must not only maintain a physical book containing the name, contact information and ink-signatures of each guest that stays with the host for a period of 3 years, but that "upon request by any authorized city official, shall make such records available for inspection by such city official during regular business hours or in the case of an emergency." *See* SHO §§ 4-6-300(f)(2), (3) and §§ 4-14-040(b)(8), (9).

174.    These provisions of the Shared Housing Ordinance clearly violate the Fourth Amendment as set forth in *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015).   The Fourth Amendment does not allow city officials to view a private home-owner's records of his or her guests on demand.

175.    Additionally, with respect to "vacation rental" licensees, the Shared Housing Ordinance states that "[t]he building commissioner is authorized to mandate an inspection of any vacation rental, at any time and in any manner, including third-party reviews, as provided for in rules promulgated by the building commissioner." *See* SHO § 4-6-300(e)(1). The same provision also states that "[i]f the licensee provides food to his guests in the vacation rental, the board of health may inspect the vacation rental in accordance with rules promulgated by the board of health." *See* SHO § 4-6-300(e)(2).

176.    Further, for shared housing hosts who maintain more than one unit, Section 4-16-230(a) states that "[t]he building commissioner is authorized to mandate an inspection of any shared housing unit operated by a shared housing operator at least once every two years at a time and in manner, including third-party reviews, as provided for in rules and

regulations promulgated by the building commissioner."

177.    These provisions of the Shared Housing Ordinance independently violate the Fourth Amendment and *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977). In *Camara*, a tenant refused to consent to a warrantless inspection of his property and then sued to enjoin prosecution for violation of a housing code.   The San Francisco building inspectors were acting pursuant to a San Francisco ordinance that allowed them to enter a building without a warrant and check for possible building code violations.   The Supreme Court held that a warrantless search of residential property by municipal inspectors violated the Fourth Amendment protection against unreasonable searches and seizures. *Id.* at 528-534.

178.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.   This injury can be redressed by the requested relief of a declaratory judgment.

179.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.   This injury can be redressed by the requested relief of a declaratory judgment.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS

WOLF respectfully request and pray for a declaratory judgment that the aforementioned provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* in violation of the Fourth Amendment, and that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered.

## COUNT V

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
### STORED COMMUNICATIONS ACT – 18 U.S.C. § 2701, et seq.

180.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

181.    The Stored Communications Act, 18 U.S.C. § 2701, *et seq.*, was enacted to extend the protections of the Fourth Amendment to electronic communications and records generated, stored and transmitted through and by third-party internet service providers such as Airbnb.

182.    The Shared Housing Ordinance requires an "intermediary" to "bulk register" its shared housing hosts with the City, and thereby to disclose to a government entity the personal information (including name, address, contact information and other information) provided by the user / member / subscriber to Airbnb's website and stored with Airbnb to the City.

183.     The Shared Housing Ordinance does not require that the user / member / host consent to such "bulk registration," nor does it require that Airbnb and other internet service providers ask such hosts for consent.

184.     Under the Shared Housing Ordinance, an intermediary is required to provide biweekly "registration reports" to the City divulging the names, addresses, contact information and other information regarding its registered shared housing hosts. SHO, § 4-13-230(c).

185.     Every two months, an intermediary is required to provide anonymized data to the City regarding the total number of listings, the total numbers of nights booked, the amount of rent paid by guests, the total tax paid by the intermediary, a cumulative tally of the number of nights **each unit** is booked during the calendar year, and a notation indicating each listing that the City has determined is ineligible, but is still listed on the platform.   SHO, § 4-13-240(a).

186.     Additionally, an intermediary is required to report the total number of "shared housing units that have been rented for more than 30 nights, along with a notation indicating which of the listings have been deemed ineligible. SHO, § 4-13-240(b).

187.     Further, an intermediary is required, every two months, to submit separate reports to each Alderman "on ward specific basis" about the listings and bookings in each ward.   SHO, § 4-13-240(c).

188.     Although these aggregate reports are permitted to be "submitted in an

anonymized form," if the City "reasonably determines" that a host or a listing is "operating in violation" of the Shared Housing Ordinance or "any other applicable provision of this Code, including, but not limited to, the Chicago Zoning Ordinance," (or is otherwise the scene of a crime), the City may subpoena the intermediary for "de-anonymized" data.   SHO, § 4-13-240(f).

189.    Upon information and belief, the City has developed a sophisticated computer interface with Airbnb, so that Airbnb can electronic send this detailed information to the City, and the City can view all of the names, addresses, and other information about each of the registered hosts.   Additionally, upon information and belief, the City of Chicago is allocating money to hire three full-time "Airbnb enforcers" whose job will be to sit at a desk, using this computer interface and Airbnb's own website, and find "Shared Housing Unit" hosts to cite for violations or deem ineligible.

190.    The "bulk registration" and reporting requirements are illegal under Section 2702 of the federal Stored Communications Act, because such disclosures of private electronically stored records are required to be made notwithstanding the absence of any voluntary and knowing consent of each shared housing host.

191.    Additionally, the reporting requirements and de-anonymization procedures in the Shared Housing Ordinance for intermediaries clearly violates Section 2703 of the Stored Communications Act, because it allows the City to view de-anonymized data regarding a shared housing unit's owner and transaction history without the consent of the

host, without prior notice to the host, without a valid search warrant, and without a court order containing a finding based upon "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic information, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

192. Because the Shared Housing Ordinance is not a criminal statute, investigations of suspected violations of the Shared Housing Ordinance cannot, by definition, be criminal investigations, absent some other suspected criminal predicate act. Therefore, the standard set forth in the Shared Housing Ordinance for de-anonymizing data – that the City "reasonably determines" that a host or a listing is "operating in violation" of the Shared Housing Ordinance – is facially insufficient under Section 2703(d) of the Stored Communications Act.

193. Section 2707(a) of the Stored Communications Act states: "Except as provided in section 2703(e), any provider of electronic communications service, subscriber, or other person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate."

194. Section 2707(b) of the Stored Communications Act states: "**Relief.** – In a civil action under this section, appropriate relief includes: (1) such preliminary and other

equitable or declaratory relief as may be appropriate; (2) damages under subsection (c); and (3) a reasonable attorney's fee and other litigation costs reasonably incurred."

195.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to whether the registration and disclosure requirements and de-anonymization procedures of the Shared Housing Ordinance violate the federal Stored Communications Act, and are therefore void and unenforceable *ab initio*.    This injury can be redressed by a declaratory judgment and injunctive relief.

196.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to whether the registration and disclosure requirements and de-anonymization procedures of the Shared Housing Ordinance violate the federal Stored Communications Act and are therefore void and unenforceable *ab initio*, This injury can be redressed a declaratory judgment and injunctive relief.

197.    The CLASS reserves its right to seek statutory damages from the City and any of its officers and agents to the extent that the City has obtained any unauthorized data or information regarding "hosts" or "guests" at Shared Housing Units from any Intermediaries.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS

WOLF respectfully request and pray for a declaratory judgment that the aforementioned provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* in violation of the Stored Communications Act, 18 U.S.C. 2701 et seq., and that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 28 U.S.C. 2707(b)(3), and for such other and further relief as is just and equitable be entered.

**COUNT VI**

**DECLARATORY JUDGMENT**
**FIFTH AMENDMENT – TAKINGS CLAUSE (ANTICIPATORY REMEDY)**

198.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

199.     The Takings Clause of the Fifth Amendment to the United States Constitutions states "nor shall private property for public use, without just compensation."

200.     The Fifth Amendment Takings Clause applies to the States and localities through the Fourteenth Amendment and the incorporation doctrine.

201.     While the Shared Housing Unit's regulation and prohibitions on home sharing on the internet does not necessarily deprive a unit owner of all economically viable use of a unit (which can still be enjoyed as a residence, rented out long-term or sold), the Shared Housing Ordinance takes from a private homeowner two essential or core property rights:   the right to exclude, and the right to permit.

202.    By declaring all registered "Shared Housing Units" and licensed "Vacation Rentals" to be "public accommodations," the Shared Housing Ordinance removes the ability of a private homeowner to exclude others from his or her home, simply because that homeowner maintained a listing on a home sharing platform.

203.    This declaration marks a clear departure from what has been called the "Mrs. Murphy Boarding House Exemption" that can be found in the Fair Housing Act and the 1964 Civil Rights Act, which excludes from the definition of "public accommodation" any building with four or fewer rental units where the owner occupies one of them. ("Mrs. Murphy" is a hypothetical elderly widow who has converted a portion of her home into a rental apartment to supplement her income.)

204.    The right to exclude the outside world from one's property and the right to permit invited guests of one's own choosing onto that property are two sides of the same coin. By purporting to ban the ability of owners to host guests of their own choosing without prior permission from the government, the Shared Housing Ordinance takes away the essential property right of being able to host guests of one's own choosing.

205.    Where an essential property right is taken away, a *per se* taking exists, and no proof of loss of all economically viable use is required. *See, e.g., Kaiser Aetna v. United States*, 444 U.S. 164 (1979); *see also Horne v. U.S. Dep't of Ag.*, 135 S. Ct. 2419 (2015); *Hodel v. Irving*, 481 U.S. 704 (1987).

206.    Additionally, the Shared Housing Ordinance allows for takings of these

property rights for non-public or private uses. In particular, by empowering neighbors to shut down hosts by manufacturing "excessively loud noise" complaints based solely on the allegation of an audible sound coming from a shared home, or manufacturing other hair-trigger violations, the Shared Housing Ordinance simply transfers a unit owner's property rights to his or her neighbors.

207. The Shared Housing Ordinance also takes private property for non-public uses by taking private prohibitions contained in contract or in local condominium bylaws and making them illegal and punishable by law (including fines and prohibitions on future rental and speech activity), and enforceable with taxpayer money.

208. The Shared Housing Ordinance contains no available remedy against such takings, which are inchoate and have uncertain or unknown value. Especially for new hosts or owners who have never listed their homes on home sharing sites in the past, but may wish to in the future, such hosts or putative hosts will be unable to establish the amount of just compensation in a court of law, because of the "new business rule" which prohibits an award of damages based on speculation about the profitability of a new enterprise.

209. Additionally, plaintiff KEEP CHICAGO LIVABLE is suffering the present and continuing injury of not being able to properly advise its host-members as to whether they may have an actionable takings claim for just compensation from the City of Chicago if and/or when the law takes effect, because there is a dispute about whether the Shared Housing Ordinance takes away a compensable property right under the Takings Clause.

210.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.   This injury can be redressed by the requested relief of a declaratory judgment.

211.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.     This injury can be redressed by the requested relief of a declaratory judgment.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF respectfully request and pray for a declaratory judgment that the aforementioned provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* in violation of the Fifth Amendment, or that a declaration be entered that because of the foregoing provisions, the CLASS is entitled to just compensation from the City of Chicago and that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered.

## COUNT VII

## DECLARATORY JUDGMENT
## EIGHTH AMENDMENT – EXCESSIVE FINES CLAUSE

212.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

213.    The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

214.    The Eighth Amendment applies to the States and localities through the Fourteenth Amendment and the incorporation doctrine.

215.    The Shared Housing Ordinance contains fines of $3,000 per day against individuals who post a listing on an internet home sharing platform, and fail to take down such listing after the City determines that it is ineligible.   The procedure set forth in the Shared Housing Ordinance requires the City to notify only the shared housing intermediary or advertising platform, who is then required to notify the host.   However, it is entirely possible that a host could have placed a listing and forgotten about it and/or changed his or her email address, such that a notice sent by email is either ignored, not seen or moved to a "spam" or "junk mail" folder.

216.    The Shared Housing Ordinance also contains fines of up to $3,000 per day per violation for offenses including (1) providing food or wine to guests, (2) not having

"sanitized" utensils, (3) not having clean towels, (4) failure to get a guest who booked on the internet to hand-sign with ink-and-paper his or her signature in some other physical book, (5) having a dog, cat or other pet at the same time that there is food available in the same "Shared Housing Unit" or "vacation rental", (6) failure to post an evacuation diagram of every single exit not only from the dwelling unit, but from the entire building, and other minor infractions that are alleged to have occurred.

217.    The Shared Housing Ordinance also contains fines of up to $5,000 per day per violation for offenses committed by guests or others affiliated with guests, even if such offenses occur outside of the dwelling unit and outside of the knowledge or control of the host.   Offenses possibly subject to $5,000 fines including permitting an "egregious condition" to occur, which includes allowing a guest to join a private TV watching party in the dwelling unit where the price of admission is "BYOB," or hosting a political event at an Airbnb location where the invitees are limited to donors to the candidacy of the guest.

218.    Additionally, the Shared Housing Ordinance contains sanctions beyond monetary fines that include forfeitures of the right of hosts found to have committed violations or to be ineligible under the Shared Housing Ordinance to rent, or to allow family members to rent, the dwelling unit long-term.   *See* SHO 4-6-300(h)(4) and 4-14-050(i).

219.    The Shared Housing Ordinance contains punitive fines that are grossly disproportional to the gravity of the offenses, and are therefore unconstitutional, unenforceable and void *ab initio*.

220.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.  This injury can be redressed by the requested relief of a declaratory judgment.

221.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.     This injury can be redressed by the requested relief of a declaratory judgment.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF respectfully request and pray for a declaratory judgment that the aforementioned provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* in violation of the Eighth Amendment of the United States Constitution, and that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered.

### COUNT VIII

### DECLARATORY JUDGMENT
### FOURTEENTH AMENDMENT – DUE PROCESS CLAUSE

222.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 116 as if fully set forth herein.

223.    Section 1 of the Fourteenth Amendment to the United States Constitution states in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the Untied States, nor shall any State deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws."

224.    As noted by the Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104 (1972), "Vague laws may trap the innocent by not providing fair warning… a vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application…. [W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Id.* at 108-109.

225.    A law that does not provide the kind of notice that would enable persons or ordinary intelligence to understand what conduct is prohibited, or that authorizes arbitrary or even discriminatory enforcement, is impermissibly vague in violation of the rights of all citizens to Due Process provided under the Fourteenth Amendment.

226.    The Shared Housing Ordinance is overbroad and vague, and reaches a substantial amount of constitutionally protected conduct.

227.    The Shared Housing Ordinance does not clearly distinguish between a "Shared Housing Unit" and a "Vacation Rental."

228.    The Shared Housing Ordinance contains an exception for "guest suites" that would seemingly apply to any host who is selective about which guests to invite and when, and is therefore not making the space available to members of the general public.

229.    If the statutory definition of "guest" contained in the Shared Housing Ordinance is used in the definition of "guest suite", the Shared Housing Ordinance is literally incomprehensible.

230.    Additionally, the SHO provides ambiguously that if a host "provides food" to a guest, the host must then "comply with all applicable food handling and licensing requirements of the [Food Code] and board of health regulations."

231.    The Shared Housing Ordinance does not define what it means for a host, who lives in the dwelling unit as his or her primary or secondary residence, to "provide food" to a guest.

232.    Typically, most homes have food in the pantry or refrigerator, and very few homes have padlocks on the pantry and refrigerator doors.

233.    If providing food means having food available, then hosts must make substantial, impracticable renovations to their home to meet the health code standards for commercial kitchens, including installing grease traps, vents, dishwashing machines and a separate hand-wishing sink in the kitchen area.   Additionally, a host that has food in the

refrigerator would have to get rid of his or her dog, cat or other pet, because the Food Code prohibits such animals in the food preparation area.

234. Further, the Food Code states that "[n]one of the operations connected with a food establishment shall be conducted in any room used as living or sleeping quarters." Thus, arguably, if a host has food in his or her refrigerator, the host cannot actually host a guest under the Shared Housing ordinance.

235. The Shared Housing Ordinance does not define which portions of the 68-page Food Code are "applicable" to a Shared Housing Unit or Vacation Rental that "provides food" to a guest.

236. A vacation rental license (or a shared housing unit registration) can be revoked if there are three or more "objectionable conditions".

237. An "objectionable condition" includes "excessive loud noise," which means "any noise, generated from within *or having a nexus to* the rental of the shared housing unit, *between 8:00 p.m. and 8:00 a.m.* that is louder than the average conversational level at a distance of 100 feet or more, measured from the property line of the vacation rental.

238. The standard of conduct – noise that is louder than the "average conversational level at a distance of 100 feet *or more*" - is incomprehensible, unless it simply means any noise, not only because there is no such thing as an "average conversational level," but also because the "average conversational level" at an infinite distance (100 feet or more) is imperceptible – even at 100 feet, it is most likely

imperceptible.

239.    The SHO makes it illegal for a host to list a room or a home on a home sharing site depending on the listing activities of his or her neighbors, even though the neighbors may be listing on a different home sharing site and most likely are anonymous to each other.

240.    For owners in 3-flats (two to four dwelling unit buildings), only one such host may list at any given time.

241.    For owners in high-rise buildings (5 or more dwelling units), the maximum cap for listings is 6 units, or 25% of the number of dwelling units, whichever is less.

242.    Once this maximum cap is exceeded, all listings are deemed illegal and subject to $3,000 per day fines.

243.    There is no public, central website or information source where a host can determine how many other listings there are at any given time in the building, on the myriad of different internet platforms that facilitate home sharing.

244.    There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.   This injury can be redressed by the requested relief of a declaratory judgment.

245.    There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated

individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of material portions of the Shared Housing Ordinance.     This injury can be redressed by the requested relief of a declaratory judgment.

WHEREFORE, Plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF respectfully request and pray for a declaratory judgment that the aforementioned provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* as overbroad and impermissibly vague in violation of the Due Process Clause in the Fourteenth Amendment of the United States Constitution, and that injunctive relief be entered against the City of Chicago from enforcing these provisions, that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988, and for such other and further relief as is just and equitable be entered

## COUNT IX

## DECLARATORY JUDGMENT
## 4% ADDITIONAL SURCHARGE – ILLINOIS CONSTITUTION

246.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

247.    In Section 3-24-020 of the Chicago Municipal Code, as amended by the Shared Housing Ordinance, the definition of "hotel accommodation" includes both vacation rentals and shared housing units in the same category as rooms held out to the public as inns, motels, bed-and-breakfast establishments and hotels.

248.     Section 3-24-030(B) of the Shared Housing Ordinance creates a new "surcharge … upon the rental or leasing of any hotel accommodations at any vacation rental or shared housing unit … at a rate of four percent of the gross rental or leasing charge".

249.     This new "surcharge" or tax was imposed "[i]n addition to the tax imposed" under Section 3-24-030(A), which was the City of Chicago's pre-existing "hotel operator occupation tax" on hotel accommodations "at a rate of four and one-half percent of the gross rental or leasing charge."

250.     Unlike most of the Shared Housing Ordinance, which would not go into effect until 150 days after publication (or December 19, 2016), the new 4% "surcharge" was set to "immediately accrue" upon passage of the Shared Housing Ordinance in June 2016.

251.     Upon information and belief, the City of Chicago has been collecting this 4% additional surcharge, in addition to the pre-existing 4.5% HOOT, on all vacation rental and shared housing unit activity since July 2016.

252.     This new 4% surcharge is unconstitutional under Article IX, Section 2 of the Illinois State Constitution of 1970, which provides "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly."

253.     Under the Chicago Municipal Code, as amended by the Shared Housing Ordinance, a room in a motel or hotel is taxed by the City of Chicago at a rate of 4.5% of the charge.

254. However, under the Chicago Municipal Code, as amended by the Shared Housing Ordinance, a room in a vacation rental or a shared housing unit is taxed by the City of Chicago at a rate of 8.5% of the charge, even though "vacation rentals" and "shared housing units" are defined within the same category as "hotel accommodations."

255. Further, the additional 4% surcharge violates Section 6(e) of Article VII and Section 1 of Article IX of the Illinois Constitution.

256. Section 6(e) of Article VII prohibits a home rule unit from "impos[ing] taxes or measured by income or upon occupation" without express authorization from the Illinois General Assembly.

257. Section 1 of Article IX of the Illinois Constitution states that "[t]he General Assembly has the exclusive power to raise revenue by law except as limited or otherwise provided in this Constitution."

258. The Illinois General Assembly has authorized home rule units to impose and collect "hotel operator occupation tax" under the Hotel Operators Occupation Tax Act, 35 ILCS 145/1 *et seq.* However, Sections 3(a) and (b) of the Hotel Operators Occupation Tax Act only authorize a tax "imposed upon persons engaged in the business of renting, leasing or letting rooms in a hotel" at a maximum rate of 6% of 94% of the gross rental receipts from such renting, leasing or letting (excluding any taxes imposed under Section 13(c) of the Metroplitan Pier and Exposition Authority Act)."

259. The additional 4% surcharge on vacation rentals and shared housing units not

only discriminates between "hotel accommodations" but because the maximum rate is 8.5% and is charged against the entire gross receipts from vacation rental and shared housing unit activity, violates Section 6(e) of Article VII and Section 1 of Article IX of the Illinois Constitution.

260. There is a substantial and continuing controversy between plaintiff KEEP CHICAGO LIVABLE and the CITY OF CHICAGO as to the constitutionality and thus enforceability of the additional 4% surcharge imposed only upon "vacation rentals" and "shared housing units" in the Chicago Municipal Code as amended by the Shared Housing Ordinance.

261. There is also a substantial and continuing controversy between plaintiff BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, and the CITY OF CHICAGO as to the constitutionality and thus enforceability of the additional 4% surcharge imposed only upon "vacation rentals" and "shared housing units" in the Chicago Municipal Code as amended by the Shared Housing Ordinance.

WHEREFORE, plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, respectfully request and pray for a declaratory judgment that the aforementioned additional 4% surcharge provisions of the Shared Housing Ordinance be stricken as unconstitutional, unenforceable and void *ab initio* in violation of the Illinois

Constitution of 1970, that injunctive relief be entered against the City of Chicago from enforcing these provisions and ordering the City of Chicago to issue refunds to all hosts and guests in the class who have been charged this illegal surcharge, and that reasonable attorneys' fees and costs be awarded as authorized under 42 U.S.C. 1988 or any applicable State law, and for such other and further relief as is just and equitable be entered.

## COUNT X

### INJUNCTIVE RELIEF
### VIOLATION OF ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1 *et seq.*

262.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 116 and 182 through 189 as if fully set forth herein.

263.     The Shared Housing Ordinance requires Airbnb to divulge the trade secrets of its hosts and guests – including each host's name, private contact information, customer lists and transaction history – to the City of Chicago, without each host's prior, knowing and voluntary consent.

264.     Upon information and belief, the City of Chicago and Airbnb have developed a computer interface that allows the City of Chicago to view all of these proprietary trade secrets of the Airbnb hosts in Chicago in real-time, without court supervision and with only the slightest pretense.

265.     The Shared Housing Ordinance conditions Airbnb's eligibility to operate its business in the City of Chicago upon Airbnb's compliance with the City of Chicago's

reporting scheme, and thus upon Airbnb's misappropriation of its hosts' proprietary trade secrets.

266.    The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, provides for injunctive relief against such "misappropriation" of trade secrets, and further allows for damages for actual losses or measured by a misappropriator's unauthorized disclosure or use of a trade secret.

267.    Upon information and belief, this system of misappropriation of trade secrets will go into full effect on or about December 19, 2016, to the extent it has not already.

WHEREFORE, plaintiffs KEEP CHICAGO LIVABLE and BENJAMIN THOMAS WOLF, individually, and the putative CLASS of similarly situated individuals he represents, respectfully request and pray that the CITY OF CHICAGO be enjoined from further viewing, accessing or obtaining the confidential trade secrets of Airbnb and other shared housing hosts in Chicago from third party intermediaries or advertising platforms, absent a criminal search warrant, court order, or express, voluntary and knowing consent by each such possessor of trade secrets, and further that all title to the source code for any software programs or computers designed to interface between Airbnb and other intermediaries or advertising platforms and the City of Chicago and that contain trade secrets or any information derived from trade secrets be transferred over to plaintiffs, or catalogued and destroyed, and that all persons who have had access to such records be enjoined from participating in any enforcement activities of any kind against shared

housing activities, with the exception of emergency situations, or pursuant to express court order, that Plaintiffs be grated their reasonable attorneys' fees and costs, and for such other and further relief as is just and equitable.

Respectfully submitted,

KEEP CHICAGO LIVABLE, an Illinois not-for-profit corporation, and BENJAMIN THOMAS WOLF, individually and on behalf of those similarly situated,

\s\ Shorge Kenneth Sato
One of their Attorneys

SHORGE KENNETH SATO
*Shoken Legal, Ltd.*
125 South Clark Street, Floor 17
Chicago, Illinois 60654
(773) 206-7630
ARDC: 6278382

*Co-Counsel:*
ROBERT REDA
*Reda & Des Jardins, LLC*
736 N. Western Avenue
Suite 353
Lake Forest, Illinois 60045
877-809-4567
ARDC: 6199867

## JURY DEMAND

A jury of 12 is hereby demanded by Plaintiffs for all issues of fact triable by a jury.