

125 South Clark Street, 17th Floor
Chicago, Illinois 60603
Ph: (312) 547-1600
Fx: (312) 265-2995
Email: board@keepchicagolivable.com

**Board of Directors:**
Ben Wolf
Valerie Landis
Jon Dimetros
Marc Manning
Erika Woolman

September 14, 2016

To Whom It May Concern:

Keep Chicago Livable is a Chicago nonprofit formed by local Chicago homeowners and renters who have previously used the home-sharing internet platforms such as Airbnb, or who are interested in doing so. Keep Chicago Livable was formed following the June 22, 2016 passage of the Chicago "Shared Housing Ordinance" (the "Ordinance"), with the intent of educating homeowners and renters in Chicago as to this law, their new duties of compliance under this law, and about best practices and guidelines for responsible home-sharing.

Keep Chicago Livable has held a number of public and private meetings with hosts and homeowners interested in learning about responsible home sharing in Chicago under this new law. Many have expressed frustration and confusion about the Ordinance and what it seems to require. We are ourselves frustrated and confused as well, because this Ordinance appears to regulate home-sharing, but in operation, effectively bans it.

To be clear – we are not affiliated with or being supported in any way by Airbnb or any other such sites, directly or indirectly (other than through past hosting activity), financially or non-financially. We are simply Chicagoans who have questions and concerns.

We would like to hear your response to the following set of questions – either in writing or in person.

(1) Why is this law even necessary? Why now? In 2015, Airbnb activity injected $30 million directly into the pockets of local hosts, from out-of-state guests mostly, and over $200 million into the local economy. With property taxes skyrocketing and our economy stalling, why pass a law that will **_decrease tax revenues, depress property values, hurt tourism,_** and **_increase the vulnerability of the middle class to economic fluctuations?_**

(2) One of the arguments for regulating Airbnb is "preserving affordable housing." Can the City point to a single study that points to Airbnb activity as a contributing factor for why rents are high in luxury neighborhoods such as River North, Lincoln Park, Streeterville and the Gold Coast? Is it not the case that rents were high in those neighborhoods even before Airbnb existed?

(3) If most of the "proliferating" Airbnb activity is occurring in these neighborhoods, and if over 80 percent of Airbnb hosts in Chicago are renting out rooms in their own homes, wouldn't the real effect of this law be to push those homeowners out of their homes and into less expensive neighborhoods

such as Albany Park, Humboldt Park and Pilsen (or out of Chicago entirely), thereby ***accelerating gentrification*** in the "outer" neighborhoods?

(4) The Ordinance is 57 pages and over 25,000 words long, and written in dense legalese that the Chicago Tribune described as "dizzyingly complex." The Ordinance also requires that all hosts that wish to register their homes as "shared housing units" must sign an attestation – under penalty of law – that they have "read and understood" this law.

   a. Do you honestly think that hosts – many of whom are not legally trained or sophisticated - will read and understand this Ordinance before signing this "attestation"?

   b. What safeguards will be put in place to ensure that hosts can afford independent legal counsel to understand this new law?

   c. Why is this attestation requirement even necessary?

(5) A "vacation rental" is defined as "a dwelling unit that contains 6 or fewer sleeping rooms that are available for rent or for hire for transient occupancy by guests." A "shared housing unit" is "a dwelling unit containing 6 or fewer sleeping rooms that is rented, or any portion therein is rented, for transient occupancy by guests."

   a. Would you agree that these definitions are functionally identical?

   b. Why were they defined in this way?

   c. If a person owns a 2-bedroom condominium, and wishes to list their second bedroom on Airbnb, are they required to obtain a license as a "vacation rental" or register as a "shared housing unit"?

(6) One of the more concerning aspects of the Ordinance is that it transforms private homes into "public accommodations."

   For example, a female Airbnb host who prefers to book to other females for safety reasons would now be seemingly required to take men as well.

   Please explain why this would not be the case.

(7) Even though Airbnb itself keeps records of all host and guest information, the Ordinance creates additional requirements such as the requirement that hosts keep "pen-and-paper" guest books and have the guests manually sign each book, and to maintain these books for 3 years. Failure to do so counts as a $3,000 per day penalty.

   What is the reason for this requirement, other than to burden hosts?

(8) The Ordinance requires that hosts must post signs on the inside of their own home, by their front door, including a sign containing the host's real name and contact information.   Such a sign would then be visible by neighbors or passerby's, who would then know that the host uses Airbnb or a similar site.  Such a sign would also subject the host to a risk of identity theft – for example, some women choose to use just their first name to avoid stalkers.  Failure to post such a sign counts as a $3,000 per day fine.

What will the City Council do to protect women and other vulnerable populations who will be exposed to new and increased risks of home burglary, identity theft, stalking and rape as a result of this law?

(9) Both the definitions of "vacation rental" and "shared housing unit" exclude "guest suites."  A "guest suite" is defined as "a dwelling unit that is available for rent or for hire for transient occupancy solely by the guests or family members of residents of the building which contains the dwelling unit, and is not offered, advertised, or made available for rent or for hire to members of the general public."

How does the City intend to distinguish between "guests … of the residents" and "members of the general public"?

(10)    Both the "vacation rental" and "shared housing unit" sections state that if a host "provides food to guests," the host then has a "duty to comply with all applicable food handling and licensing requirements of this Code and board of health regulations."

   a. What does it mean to "provide food to a guest"?  Does that include having food in one's own refrigerator or pantry?  What about a bowl of fruit?

   b. The Food Code is 68 pages.  Which of the board of health regulations would be considered "applicable" if a host "provides food to a guest"?

   c. The Food Code governs commercial kitchens.  As you know, there is not a single Chicagoan whose home kitchen would meet the standard for a commercial kitchen – in part because it requires substantial renovations and upgrades, such as the installation of a commercial dish washing machine, grease traps and separate hand-washing sinks.  Also, under the Food Code, it is illegal to operate a commercial kitchen in any living quarters.   It is also illegal to have a dog in a commercial kitchen area.

   Does the Ordinance require all hosts to throw away all food in their own home before they can host?   Does the Ordinance force a host to choose between having food or having Fido?

3

(11) The Ordinance declares "egregious conditions" to be illegal, and requires that hosts affirmatively report their guests to the police if an "egregious condition" occurs or if the host suspects that an "egregious condition" occurs.

An "egregious condition" is defined as including the "holding out of the unit to members of the general public as the location of a party, amusement or event."

Does this mean that a candidate for political office who rents an Airbnb to host an event for constituents is violating the new law? Why not?

(12) The Ordinance provides that if an Airbnb is the "situs" of three or more "objectionable conditions" within one year, a license or registration can be suspended or immediately revoked. An "objectionable condition" is defined as including "any noise, generated from within or having a nexus to the rental of any shared housing unit, between 8:00 P.M. and 8:00 A.M. that is louder than the average conversational level at a distance of 100 feet or more"

How loud is the "average conversational level at a distance of 100 feet or more"? Please answer in decibels.

How is the average Airbnb host supposed to know how loud that is?

Does this mean that a nosy neighbor who hates Airbnb or has a grudge against a hosting neighbor can object if he or she hears **any** noise above a whisper coming from an Airbnb?

(13) How do the "maximum caps" work – if in a large high rise with more than 100 units, for example, there are 3 units listed on Airbnb, 2 listed on VRBO and 1 listed on Homeaway, and if a 7th person lists on some other intermediary or advertising platform, who gets to keep their listing?

(14) If a unit is determined to be ineligible, the Ordinance requires Airbnb to notify the host to take down his or her listing. If the host fails to take down the listing, the host is subject to $3,000 per day penalties. What steps will the City take to ensure that the host receives prompt and proper notice of a determination of ineligibility?

(15) The Ordinance requires Airbnb to provide bimonthly "anonymized" or aggregated reports to the City and to Aldermen. However, the City can request de-anoynmized reports that can disclose personal information about hosts, using a routine administrative subpoena, and use those reports to fine hosts for violations.

What notice will be provided to hosts so that they can seek a court order to prevent Airbnb from making such disclosures? What kind of evidence will

the City require before requesting that Airbnb disclose the identity of hosts to the City?

These are but a few of the serious questions our members have about this new law. Over 5,000 Chicagoans have used services such as Airbnb to pay their taxes, their mortgage, their rent and their other cost-of-living expenses. Countless people have told us that Airbnb is a literal lifeline, especially through times of temporary unemployment. More than dollars and cents, however, Keep Chicago Livable is about protecting something more fundamental, that affects everyone: the "sanctity of the home." What does it mean to own a home in Chicago, if the Government can send in inspectors "at any time and in any manner" without a warrant, or if the Government can dictate how often one does the laundry or dishes (with a $3,000 penalty)?

***Why do homeowners have to ask the Government for permission to have guests sleepover?***

We look forward to hearing from you.

Sincerely,

Keep Chicago Livable