IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEEP CHICAGO LIVABLE, an Illinois not-for-profit corporation, and BENJAMIN THOMAS WOLF, SUSAN MALLER, DANIELLE MCCARRON, ANTOINETTE WONSEY, MONICA WOLF and JOHN DOE, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF CHICAGO, a Municipal corporation,<br><br>Defendant. | NO.  1: 16-cv-10371<br><br>Hon. Judge Sara Ellis<br><br>**MEMORANDUM OF LAW IN SUPPORT PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION** |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

NOW COME plaintiffs KEEP CHICAGO LIVABLE, an Illinois not-for-profit corporation ("KCL"), BENJAMIN THOMAS WOLF ("Ben"), SUSAN MALLER ("Susan"), DANIELLE MCCARRON ("Danielle"), ANTOINETTE WONSEY ("Antoinette"), MONICA WOLF ("Monica") and JOHN DOE ("Doe," and together with KCL, Benjamin, Susan, Danielle, Antoinette, and Monica, "Plaintiffs"), by and through their undersigned attorney, with their Memorandum of Law in Support of their Amended Motion for Preliminary Injunction:

### I. The SHO Violates Equal Protection, Or At Least, A Fair Question Is Raised.

Although Plaintiffs believe that fundamental interests are at stake, this Honorable Court need not reach that question in deciding whether to enter a preliminary injunction against the stayed portions of the Shared Housing Ordinance, as amended, because this law violates the Equal Protection Clause without a rational basis, at least as applied to Susan, Danielle and Ben, as the attached chart shows:

|  | **Shared Housing Unit** | **Guest Suite** | **Hotel** | **Reference** |
|---|---|---|---|---|
| Provides "Hotel Accommodations" | ☒ | ☒ | ☒ | 3-24-020(A)(4) |
| Per Unit Licensing Fee | **$60[1]** | **$0** | **$2.20[2]** | 4-5-010(36) |
| 17.4% Hotel Operator Occupancy Tax | ☒ | ☒ | ☒ | 3-24-030(A) |
| 4.0% Additional Surcharge[3] | ☒ | ☐ | ☐ | 3-24-030(B) |
| Registration / License Required | ☒ | ☐ | ☒ | 4-14-020(a) |
| Must be Natural Person | ☒ | ☐ | ☐ | 4-14-020(b)(1) 4-13-260(a)(8) |
| Attestation required to advertise on internet | ☒ | ☐ | ☐ | 4-14-020(c) |
| Annual Registration review | ☒ | ☐ | ☐ | 4-14-020(h) 4-13-260(a) |
| Required Listing Information | ☒ | ☐ | ☐ | 4-14-020(f) 4-14-040(a) 4-14-040(b)(4) |
| Required police reporting on Mere Suspicion of Guests' criminal activity[4] | ☒ | ☐ | ☐ | 4-14-040(b)(3) 4-14-050(a) |
| Alcohol Prohibited | ☒ | ☐ | ☐ | 4-14-050(d) |
| Maximum occupancy restrictions[5] | ☒ | ☐ | ☐ | 4-14-050(b) |
| Unamplified noise (i.e., conversational noise) restrictions | ☒ | ☐ | ☐ | 4-14-080(c)(2) |
| Liability for off-premises behavior by guests | ☒ | ☐ | ☐ | 4-14-080(c)(2) 4-14-080(c)(3) |
| Duration of license/registration revocation | **2 years** | **N/A** | **1 year** | 4-14-090(d) 4-6-180(f)(2) |
| Min / Max Penalties for Violation (per day | **$1,500 / $3,000 $2,500 / $5,000** for | **N/A** | **$250 / $500** | 4-14-060(g) 4-14-090(a) 4-4-010 4-6-180(f)(1) |

---

[1] Paid for by intermediaries such as Airbnb. Estimated annual fee: $300,000 (assuming 5,000 units),

[2] In Chicago, hotels are required to pay a $185 per establishment licensing fee every two years.

[3] Estimated by City to raise $2 million per year, ostensibly for the homeless.

[4] Business licensee are required to report what they are actually told or observe. Chi. Mun. Code 4-4-306. Hotels can only be held liable if they "knowingly permit" crime in units, and have an affirmative defense if they report. Chi. Mun Code 4-6-180(e)(2).

[5] Shared Housing Units have an "absolute maximum" occupancy limit of 1 person per 125 square feet. By comparison, under Chi. Mun. Code 13-196-480, residential family units require 125 square feet for the first **two** occupants, and at least 100 sq. ft. for the next two occupants, and 75 sq. ft. for each additional occupant. There is no maximum occupancy limit for hotel rooms or guest suites, other than those required for fire code.

|  | **Shared Housing Unit** | **Guest Suite** | **Hotel** | **Reference** |
|---|---|---|---|---|
|  | ineligibility |  |  |  |

The Equal Protection Clause obviously applies with much more force when the classifications infringe upon fundamental liberty interests, such as the right to free speech and the freedoms of intimate and expressive association. In such instances, if such interests are found to exist, strict scrutiny must be applied. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

However, even under the rational basis test, this law is wholly irrational, especially as applied to plaintiffs Susan, Danielle and Ben and those similarly situated to them.

**A. There Is No Rational Basis For Classifying Susan Maller Differently Than Atwater Apartments When It Comes To Providing "Hotel Accommodations."**

The Equal Protection clause "commands that states treat similarly situated people in a similar manner." *Fareem-El v. Klincar*, 841 F.2d 712, 727 (7th Cir. 1988) (en banc). Under the rational basis test, legislation is presumed to be valid, and will be sustained so long as the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985). While rational basis is an extremely deferential standard, the Shared Housing Ordinance classifications make absolutely no sense.

"Guest Suites", which are typically owned by the corporate entities that own and control luxury high-rise apartment buildings in Chicago, are wholly unregulated by the Shared Housing Ordinance or any other known short-term rental ordinance. "Guest suites" are dwelling units that are offered for rent or for hire, for transient occupancy and for a fee, to the invitees of residents of the building. Susan Maller lives in one such building, Atwater Apartments, at 355 E. Ohio Street. (*See* Sworn Statement of Susan Maller, attached hereto as ***Exhibit "A"***).

Atwater Apartments own, operates and publicly advertises a "guest suite" as an amenity for its residents. (*See* Luxury Apartments Chicago, "Atwater Apartments," attached hereto as ***Exhibit "B"***).

The Atwater Apartments Community Policies and Procedures (attached hereto as ***Exhibit "C"***) not only do not prohibit guests – they expressly state, "Guests are welcome at our property… Guests of all ages must limit their stay to no more than 14 days per year unless prior written approval from Management has been obtained."

Susan wishes to host a guest for transient occupancy through Airbnb. However, Susan's guest would be required by the Shared Housing Ordinance to sleep in the Atwater Apartments "guest suite" instead of in Susan's apartment unit. Additionally, either Susan or Susan's guest would have to pay a fee to Atwater Apartments for the privilege of using the "guest suite." Similarly, Danielle McCarron lives (or until recently, used to live) at Hubbard Place, a building that both (a) advertises and operates a "guest suite" and (b) has placed itself on the "Prohibited Buildings List." (*See* Am. Cmplt., Exh. 3, Dkt. No. 29-3, PageID#556; *see* City of Chicago Data Portal, "Prohibited Buildings List," *available at* https://data.cityofchicago.org/Buildings/House-Share-Prohibited-Buildings-List/7bzs-jsyj/data (last viewed Feb. 28, 2017)). Unlike Susan, Danielle is prohibited from even ***advertising*** the opportunity for a guest on Airbnb to stay with her – even in the "guest suite".

The City has asserted that its governmental interest is "consumer protection." There is no legitimate governmental interest in the City regulating where Susan's or Danielle's guest might sleep, or who should ultimately get paid for such privilege. In the context of the same guest, same building, same weekend, same fee, the risk that the guest would be defrauded or unsatisfied would be exactly the same, regardless of where the guest slept or who the guest paid.

The City has also asserted a vague interest in "public safety." However, there is no reason to believe that Airbnb hosts (or guests) are any more likely to commit crimes endangering property or public safety than any other visitor or guest, or that they are more likely to commit crimes when staying in a resident's apartment unit as opposed to staying in a guest suite a few floors away.

More fundamentally, the "public safety" rationale ignores that the crimes of rape, murder, theft and assault are already subject to strict criminal penalties – and an Airbnb host, whose name, contact information and place of residence is all disclosed to the guest ahead of time – would be easily caught and prosecuted. As the Supreme Court noted in *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) in rejecting the USDA's restriction on food stamp eligibility to "unrelated persons" because of an apprehension of "fraud," because food stamp fraud was already subject to strict criminal penalties, "[t]he existence of these provisions necessarily casts considerable doubt upon the proposition that the 1971 amendment could rationally have been intended to prevent those very same abuses." *Id.* at 536-537.

The real question is whether it is rational to treat a "stranger" met through Airbnb differently than any other guest or visitor to the Atwater Apartments or Hubbard Place or to any residence in Chicago. There is nothing about an Airbnb guest that makes them any more of a risk than your average person off the street – arguably, they are more reliable because at least the host knows personal information about that person, including their full name, contact information and other personal information.

"Discriminations are not to be supported by mere fanciful conjecture. They cannot stand as reasonable if they offend the plain standards of common sense." *See Hartford Steam Boiler Inspections & Ins. Co. v. Harrison*, 301 U.S. 459, 462 (1937). "[M]ere negative attitudes, or fear, unsubstantiated … are not permissible bases" for drawing legislative classifications. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985).

The City has presented no evidence or argument that Airbnb members are in any way more likely to threaten the public health, welfare or morals than any other guest or visitor, nor is it likely that the City could even provide a compelling reason as to why an Airbnb guest, who is vetted, verified, insured and part of a responsible community that shares norms and values, would be any more of a

risk to the public or a building than a new friend met through a dating app like Tinder.

Because there is no rational basis for this legislative classification, and especially because further it impinges on fundamental liberty interests such as speech and association (see below), the Shared Housing Ordinance must be enjoined as unconstitutional – and at a minimum, Plaintiffs have raised clearly a fair question as to their substantial likelihood of success on the merits.

### B. The Legislative Classification Between "Shared Housing Units" and "Hotels" Is Wholly Arbitrary.

Plaintiffs Keep Chicago Livable and Benjamin Thomas Wolf, on behalf of himself and those similarly situated, bring an Equal Protection challenge to the legislative classification between "shared housing units" on Airbnb and "hotels." Under the Shared Housing Ordinance, both are defined as purveyors of the same product: "hotel accommodations." SHO § 3-24-020(A)(4).

Hotels and motels are actually subject to very lax regulations. (*See* Am. Cmplt., Ex. 4, Dkt. No. 29-4, PageID#561-562). While one might be tempted to think of 5-star luxury hotels as the standard bearer, those luxury standards are dictated by market forces, not law. The same law that governs the London Hotel governs the cheap fleabag motel by the airport. (A true and correct copy of a Tripadvisor review of the Midway Inn is attached hereto as ***Exhibit "D"***).

Again, it would be one thing if "shared housing units" were subject to the **same** laws and taxes as hotels. However, under the Shared Housing Ordinance, individuals (which is the only way a shared housing unit can be owned and operated) are treated worse than corporations (which typically own and operate hotels), even though they "sell" the same "product."

It is true that legislative classifications need not be perfect, and that a legislature may address a problem "one step at a time" or even "select one phase of one field and apply a remedy there, neglecting the others." *Jefferson v. Hackney*, 406 U.S. 505, 546 (1972). However, where the City Council defined "hotels" and "shared housing units" to be the same thing; the City Council cannot

then target and isolate "shared housing units" with a 4.0% additional surcharge to fund the homeless, while also imposing onerous regulations backed by $5,000 per day fines (vs. $500 per day fines for hotels) without raising a question as to underinclusiveness. *See Dandridge v. Williams*, 397 U.S. 471, 519 (1970) ("Such underinclusiveness mainfests a 'prima facie violation of the equal protection requirement of reasonable classification, compelling the State to come foreward with a persuasive justification for the classification.") "Where a statute is defective because of underinclusion, there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." *Welsh v. United States*, 398 U.S. 333, 361 (1970).

## II. Implementation Of The Shared Housing Ordinance Should Be Enjoined Until Plaintiffs' Freedom Of Intimate And Expressive Association Claims Are Decided On The Merits

"[B]ecause the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State… [C]ertain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State." *Roberts v. United States Jaycees*, 468 U.S. 609, 618-619 (1984). The Supreme Court recognizes two distinct types of freedom of association: freedom on intimate association, and the freedom of expressive association. *Id.* at 619.

### A. An Injunction Should Issue To Prevent The Infringement Of Constitutionally Protected Intimate Associations.

Although the archetype of the type of "intimate association" is the bond represented by family and marriage, the Supreme Court has "not held that constitutional protection is restricted to relationships among family members." *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481

U.S. 537, 545 (1987). Rather, the Supreme Court recognizes a "spectrum from the most intimate to the most attenuated of personal attachments" based on a relationship's "objective characteristics." *Roberts*, 468 U.S. at 620. In assessing the "objective characteristics" of a given intimate association, a court should consider "attributes [such] as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620.

Here, the "intimate association" claims are brought by two non-Chicagoans: Monica and "John Doe." These claims illustrate that even if the Shared Housing Ordinance could be validly applied to some or even many people, there are a substantial number of people like Monica and "John Doe" to whom this law would be unconstitutional – and that therefore, the Shared Housing Ordinance is facially overbroad. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799-801 (1984).[6]

As set forth in Monica's Sworn Statement, attached hereto as ***Exhibit "E"***, Monica's freedom of intimate association is directly and substantially inhibited by the prohibition on service and provision of alcohol when she is an Airbnb guest with a host that lives in Chicago. Monica is unable to share her passion about bourbon whiskey with the one person she hand-picked to develop a close personal bond with during one of her visits to Chicago.

While she is possibly able to make such a friend and share her passion for bourbon whiskey in a public setting such as a tavern or restaurant, the intimacy of a private home is lost. Further, Monica is a member of the Bourbon Women Association: she is attempting to educate and promote the drinking

---

[6] Particularly concerning, from a "chilling" perspective, is that future plaintiffs may be deterred from ever engaging in these associations because (a) they live in a building that is on the Prohibited Buildings List, (b) they are deterred from even signing up to Airbnb and maintaining a listing for fear of the severe fines or (c) they are guests visiting from out of town, and may not be aware of the laws that prevented them from having more options in terms of hosts and accommodations.

of bourbon by *women* – who it can be presumed (just from the very existence of the group, Bourbon Women Association) – need to be educated and marketed to specifically. Again, a drunk stranger at a bar is not the same thing as a member of the Airbnb community.

From John Doe's perspective, the "Prohibited Buildings List" itself directly and substantially interferes with his freedom to associate with like-minded individuals (and even new friends) in the downtown Chicago neighborhood to which he hopes to move. John Doe is inhibited in his ability to get to know local Chicagoans in the downtown area, learn about their favorite places and see their neighborhoods, buildings and apartment units from the inside.

Although the guest pays Airbnb money to request a booking, and that money flows to the host, from the perspective of Monica and John Doe, this is not a purely or eve a primarily commercial transaction, nor is it significant or determinative if it is deemed a booking for a commercial purpose. As the Fifth Circuit Court of Appeals noted, "[o]bviously, business benefit might spring from any association, meeting, or encounter. It is well known that ofttimes it is 'not what you know, but who you know'; and people often prefer, in any event, to do business with friends and acquaintances. But this fact alone cannot be the basis for whether a club receives private association protection under the First Amendment. If it were, no club could be private for purposes of that protection." *Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1494 (5th Cir. 1995).

Rather, this relationship meets all three "attributes" or "objective characteristics" of an intimate relationship deserving of substantial protection under the freedom of intimate association. The host-guest relationship is small, highly selective and secluded in a private home. No one else is invited into that association, and its purposes are primarily or largely personal in nature. Accordingly, the City bears a significant burden of meeting the strict scrutiny standard of review because the Shared Housing Ordinance – and in particular, the two aforementioned provisions – directly and substantially

interfere with these Constitutionally protected intimate associations.

### B. An Injunction Should Issue To Prevent The Infringement Of Constitutionally Protected Expressive Associations.

The second type of associational freedom protected by the Fourteenth Amendment is that of "expressive association," or associations in furtherance of protected First Amendment expression. The two plaintiffs that illustrate the fundamental and substantial overbreadth of the Shared Housing Ordinance are Benjamin Thomas Wolf and Antoinette Wonsey.

The potential for expressive associations through Airbnb is demonstrated by Airbnb's response to recent natural disasters, such as Hurricane Matthew or the San Jose Flood, as well as Airbnb's outreach to immigrants and refugees in the wake of President Donald Trump's executive order. (True and correct copies of news articles regarding this subject are attached hereto as *Exhibit "F"*). Airbnb does not own any property, *per se*. Airbnb was able to activate its community of hosts to house relief workers, individuals and families affected by these natural and political disasters. In this sense, the ability of Airbnb hosts as a community to act not just as a commercial transaction or a business but as part of a social or political cause cannot be ignored. Airbnb's flexibility as a platform has also allowed for non-political, artistic expressive associations, as can be seen by the Chicago Art Institute's "Van Gogh Exhibit" which recreated a scale model of a bedroom in Van Gogh's paintings and marketed it on Airbnb for people to stay overnight. A true and correct copy of the Airbnb "Van Gogh" listing is attached hereto as *Exhibit "G"*.

Plaintiffs Benjamin Thomas Wolf and Antoinette Wonsey engage in Airbnb hosting for similar, social cause oriented expressive association and activism. A true and correct copy of Benjamin Thomas Wolf's sworn statement is attached hereto as *Exhibit "H"*. Ben uses Airbnb to further his academic and political career as well as to learn more about responsible home sharing advocacy. A

true and correct copy of Antoinette Wonsey's sworn statement is attached hereto as ***Exhibit "I"***. Antoinette wishes to change hearts and minds about the South Side of Chicago, and what better way than to have actual guests stay in her beautiful, immaculately kept house and see the neighborhood through her eyes?

If the mere exchange of money removed all constitutional protection for expressive association, there would be so much high value speech that would be lost that our Constitution would be unrecognizable. Obviously, a rule that flattens every association into its commercial components will be over-inclusive and allow far too much regulation that actually infringes upon fundamental liberties. The Shared Housing Ordinance is overbroad because it substantially affects clearly fundamental interests and rights such as the right to expressive association – any law that requires the Art Institute to get a BACP license is going too far.

### III. Injunction Should Issue Because The Shared Housing Ordinance Still Violates The First Amendment.

Despite the amendments to the Shared Housing Ordinance, this law still violates the First Amendment for three reasons. First, because the commercial aspect of Airbnb hosting is inextricably intertwined with the non-commercial aspects, strict scrutiny applies. Second, even if the Constitutional "commercial speech" doctrine is applied to Airbnb listings, the Shared Housing Ordinance still violates the "compelled speech" doctrine. Third, as discussed in prior briefings, the Shared Housing Ordinance, by targeting Airbnb hosts and Airbnb listings, constitutes invidious content and viewpoint based discrimination.

#### A. The Ordinance Is Still An Unconstitutional Prior Restraint On Non-Commercial Speech.

The Amended Complaint includes new factual allegations that clarifies that Airbnb does not allow hosts to list their units without including a price term. [Am. Cmplt. ¶¶ 35-37]. Thus, the ability

to host a guest met through Airbnb is inextricably intertwined with the invitation for an offer of a commercial transaction. [*Id.*] The Amended Complaint also includes new factual allegations to answer the natural follow-up question, "why does a host need to meet a guest through Airbnb?" Airbnb is the most popular, deep pool of vetted, insured guests from all over the globe. [Am. Cmplt. ¶¶ 29, 33]. Additionally, Airbnb members share a distinct set of shared values and norms that are cultivated by Airbnb, Inc. and are transmitted through the act of hosting. [*Id.* ¶¶ 32, 34]. Airbnb hosts and guests each perform a mutual selection process, based in large part on subjective criteria – and thus easily form close, personal bonds through the act of hosting and being a guest. [*Id.* ¶¶ 99-101]. In other words, a random stranger on the street is no substitute for an Airbnb guest.

Under *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988), the Supreme Court held that otherwise "commercial speech" does not retain its "commercial character" when it is "inextricably intertwined with otherwise fully protected speech." *Id.* at 796. There is no dispute that – but for the "price term" – the information communicated in a host's Airbnb listing is fully protected, high value speech. Due to the existence of the Airbnb pricing requirement in the listing (which can be seen by referring to the Airbnb Terms of Service, ¶ 7, Dkt. No. 20-4, PageID#317), a host who wishes to meet a guest through Airbnb literally cannot do so without including a price term. Accordingly, the test for fully protected speech – strict scrutiny – applies. *Riley*, 487 U.S. at 796. The City has made no showing that the Shared Housing Ordinance is narrowly tailored to advance any compelling governmental interests, or is the least restrictive way of doing so.

**B. The Amendment To The Ordinance Did Not Cure The "Compelled Speech" Defect.**

Additionally, even if the Constitutional "commercial speech" doctrine (and its lower level of intermediate scrutiny protection) should apply, the Shared Housing Ordinance, as amended, still fails for the two independent reasons advanced previously that it amounts to "compelled speech"

about a position or opinion with which a person could reasonably disagree, and because it amounts to content-based or viewpoint-based discrimination, because it targets and disproportionately burdens the speech of individual Airbnb hosts as compared to other purveyors of "hotel accommodations."

The amendment has not cured the "compelled speech" problem. The requirement that hosts register with the City and list their registration numbers in their listings subjects hosts to increased risks of undue harassment by the City, and by neighbors and/or landlords. [Dkt. No. 23-1, Exh. H-L, PageID#422-430]. Further, the amended ordinance still requires a host to attest to a statement, under penalty of law, with which they could reasonably disagree – it is not necessarily true that an Airbnb host's listing, rental and operation of his or her shared housing unit is "subject to" the Shared Housing Ordinance because this law is presently subject to this instant lawsuit, which challenges the constitutionality of the Shared Housing Ordinance on its face. *See Ex Parte Royall*, 117 U.S. 241, 248 (1886) ("An unconstitutional law is void, and is as no law."); *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.")[7]

Finally, Plaintiffs raise the mandatory police reporting requirements of Sections 4-6-300(f)(10) and 4-14-030(b)(3) as independently violating the prohibition against the "compelled speech" of opinions, because these provisions require Airbnb hosts to notify the policy not only about that which they know is criminal activity, but also that which they "suspect" is criminal activity.

---

[7] Of course, Plaintiffs are not making the claim that while this lawsuit is pending, they will refuse to comply with the Shared Housing Ordinance. Rather, plaintiffs make the more specific point that they are not required to sign an acknowledgment that their speech and conduct is "subject to" that law, because that is simply the City's opinion and litigating position. It is entirely up to this Honorable Court, and to the courts in general, to tell Airbnb hosts and the City "what the law is."

Respectfully submitted,

KEEP CHICAGO LIVABLE, et al.

\_\_\_\\s\ Shorge Kenneth Sato_____
One of their Attorneys

SHORGE KENNETH SATO
*Shoken Legal, Ltd.*
125 South Clark Street, Floor 17
Chicago, Illinois 60654
(773) 206-7630
shorge@rdlawyers.com
ARDC: 6278382