UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEEP CHICAGO LIVABLE, an Illinois not-for-profit corporation, BENJAMIN THOMAS WOLF, SUSAN MALLER, DANIELLE MCCARRON, ANTOINETTE WONSEY, MONICA WOLF, and JOHN DOE, individuals, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF CHICAGO, a Municipal corporation, <br><br> Defendant. | No. 16 C 10371 <br><br> Judge Sara L. Ellis |

**OPINION AND ORDER**

Proponents of home sharing—both hosts and guests—Plaintiffs Keep Chicago Livable, Benjamin Thomas Wolf, Susan Maller, Danielle McCarron, Antoinette Wonsey, Monica Wolf, and John Doe bring suit against the City of Chicago (the "City"), seeking to prevent the implementation of the Shared Housing Ordinance ("SHO"), which the City passed in June 2016 to regulate the home sharing industry in the City. Only Keep Chicago Livable and Wolf were plaintiffs when they first filed suit in November 2016, alleging that the SHO violates the First Amendment right to freedom of speech, the Fourth Amendment right to be free from unreasonable searches and seizures, the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, the Fifth Amendment takings clause, the Eighth Amendment excessive fines clause, the Fourteenth Amendment due process clause, the Illinois Constitution, and the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1 *et seq.* On December 1, 2016, they sought a preliminary injunction with respect to their First Amendment, due process, and SCA claims [11]. The Court

held oral argument on the motion on February 1, 2017. Thereafter, the City amended portions of the SHO on February 22, 2017, prompting an amended complaint [29] and amended preliminary injunction motion [30]. The amended complaint adds additional parties and changes the claims alleged. The First Amendment and due process challenges remain, but Plaintiffs dropped the remaining original claims in exchange for asserting violations of the Fourteenth Amendment's rights to intimate and expressive association and equal protection. Plaintiffs maintain that their filing of the amended complaint and amended motion for preliminary injunction did not moot their initial preliminary injunction motion but instead expanded upon the reasons for why an injunction should issue. Because the issues raised in the first injunction motion are ripe for decision, the Court addresses those here.[1] The Court finds that Plaintiffs have failed to meet the threshold requirements for issuance of a preliminary injunction with respect to the First Amendment and due process claims and so denies Plaintiffs' motion for a preliminary injunction [11] and the amended motion for a preliminary injunction [30] with respect to those claims.

## BACKGROUND[2]

In recent years, home sharing has become a popular alternative to the typical short-term rental options—hotels, inns, and bed-and-breakfast establishments. Home sharing usually involves individuals renting out their homes or apartments to guests in exchange for compensation. Although the concept of home sharing is not new, its popularity has increased

---

[1] Because Plaintiffs dropped their SCA claim in the amended complaint, the Court finds Plaintiffs' request for a preliminary injunction based on the SCA claim moot and does not address it further in this Opinion. To the extent that the amended motion for preliminary injunction [30] incorporates or expands on arguments related to the claims raised in the initial preliminary injunction motion, the Court addresses them here, with this Opinion operating as an adjudication of that motion as it relates to those claims.

[2] The Court takes the following facts from the complaint, briefs, and exhibits filed with the Court. To the extent the amended complaint adds allegations relevant to the Court's disposition of the motion for a preliminary injunction, the Court takes them into consideration. Similarly, the Court takes into account the February 22, 2017 amendments to the SHO.

due to the proliferation of internet platforms like Airbnb, VRBO, and HomeAway, which allow hosts to post listings of their units and connect easily with guests who would like to rent those units online.

As home sharing has increased in popularity with little oversight, cities across the country have sought to regulate the industry. The City's approach is the SHO, enacted on June 22, 2016 and further amended on February 22, 2017.[3] At a high level, the SHO requires hosts to register with the City in order to list and rent their units on sites like Airbnb or VRBO and subjects hosts to various restrictions and regulations. Additionally, the SHO requires listing platforms, like Airbnb, to obtain licenses and to provide the City with information on the units listed on their platforms.

More specifically, the SHO applies to two types of short-term rentals: "vacation rentals" and "shared housing units." The SHO defines a "vacation rental" as:

> a dwelling unit that contains 6 or fewer sleeping rooms that are available for rent or for hire for transient occupancy by guests. The term "vacation rental" shall not include: (i) single-room occupancy buildings or bed-and-breakfast establishments, as those terms are defined in Section 13-4-010; (ii) hotels, as that term is defined in Section 4-6-180; (iii) a dwelling unit for which a tenant has a month-to-month rental agreement and the rental payments are paid on a monthly basis; (iv) corporate housing; (v) guest suites; or (vi) shared housing units registered pursuant to Chapter 4-14 of this Code.

SHO § 4-6-300(a).[4] The SHO defines a "shared housing unit" similarly as:

> a dwelling unit containing 6 or fewer sleeping rooms that is rented, or any portion therein is rented, for transient occupancy by guests. The term "shared housing unit" shall not include: (1) single-room occupancy buildings; (2) hotels; (3) corporate housing; (4) bed-

---

[3] The implementation of the SHO's provisions, except those delineated in the agreed order for the stay, Doc. 19, is stayed until March 14, 2017 pending the Court's ruling on this motion.

[4] The SHO can be found at Doc. 1-1, Doc. 20-2, or Doc. 29-1. The amendments to the ordinance are found at Doc. 29-2.

        and-breakfast establishments, (5) guest suites; or (6) vacation rentals.

*Id.* § 4-14-010.[5] "Transient occupancy" means "occupancy on a daily or nightly basis, or any part thereof, for a period of 31 or fewer consecutive days." *Id.* § 4-6-290.

    In order to list units for rental, individuals must obtain a license or registration number from the City and include that number in their listing. *Id.* §§ 4-6-300(h)(1), 4-14-040(a)(4). To obtain the registration number, shared housing hosts must attest that they have reviewed a summary of the SHO's requirements and "acknowledge that the listing, rental and operation of shared housing units in the City are subject to those requirements." Doc. 29-2 § 4-13-215. Additionally, as part of the licensing and registration process, the City ensures that the rentals meet various requirements, such as location restrictions, set forth in the SHO. For example, in buildings with over five units, no more than six dwelling units, or 1/4 of the total dwelling units in the building, whichever is less, may be used as vacation rentals or shared housing units, unless the commissioner allows an adjustment. SHO §§ 4-6-300(d)(1), (l), 4-14-060(f). Single family homes may only be rented if the home is the licensee or host's primary residence, unless certain exceptions apply. *Id.* §§ 4-6-300(h)(8), 4-14-060(d). The SHO allows buildings to prohibit shared housing units in those buildings, creating a "prohibited buildings list" that, at the time of

---

[5] Although the definitions for both "vacation rental" and "shared housing unit" appear almost identical, the difference between the two appears to lie in the status of the occupant of the dwelling unit seeking to rent out the property. A close reading of the SHO suggests that only owners of dwelling units (defined to include those who lease units in a cooperative building) may obtain licenses for vacation rentals, SHO § 4-6-300(a), (b), while a "shared housing host" may be either an owner or tenant of the dwelling unit, *id.* § 4-14-010. But the City's counsel did not make this distinction clear during the hearing on the preliminary injunction hearing, instead suggesting that to the extent that someone wished to rent out their second bedroom (regardless of whether that person rented or owned the dwelling unit) not on Airbnb or another online platform but instead using the classified advertisements in a newspaper, that form of rental would be considered a vacation rental. For purposes of this Opinion, the Court generally treats vacation rentals and shared housing units interchangeably because the requirements and regulations of the two generally align but highlights the differences where appropriate.

the filing of the amended complaint included over 1,000 buildings.[6] *Id.* § 4-14-020(d). The SHO also provides for restricted residential zones, in which new or additional shared housing units or vacation rentals would be ineligible for licensing. *Id.* Ch. 4-17.

Once a vacation rental or shared housing unit is licensed or registered, the SHO imposes additional requirements on the licensee or host in listing and operating the rentals. For example, the SHO requires licensees and hosts to maintain guest registration records, including the name, address, signature, and date of accommodation of each guest, and to keep such records for three years.[7] *Id.* §§ 4-6-300(f)(2), (3), 4-14-040(b)(8), (9). Licensees and hosts must post their license number, as well as the name and telephone number of a local contact person, in a conspicuous place near the entrance of the unit. *Id.* § 4-6-300(f)(7), 4-14-040(b)(6). Other requirements include: providing guests with soap and clean linens; sanitizing cooking utensils and disposing of food, beverages, and alcohol left by previous guests; complying with all food handling and licensing requirements if food is provided to guests; and notifying police of illegal activity. *Id.* §§ 4-6-300(f), 4-14-040(b). Licensees and hosts are subject to fines and penalties for allowing criminal activity, egregious conditions, or public nuisances in their rentals. *Id.* §§ 4-6-300(g)(4), 4-14-050(a). The SHO gives the City suspension and revocation powers if egregious or objectionable conditions occur. *Id.* §§ 4-6-300(j), 4-14-080.

The SHO also targets the platforms on which short-term rentals are listed. Again, the SHO creates two categories: "short term residential rental intermediaries" and "short term

---

[6] The entire list can be found at https://data.cityofchicago.org/Buildings/House-Share-Prohibited-Buildings-List/7bzs-jsyj/data.

[7] The City amended the SHO so that, instead of requiring that a licensee or host make the records available for inspection by an authorized city official upon request, the records are now only subject to disclosure to an authorized city official pursuant to a search warrant, subpoena, or other lawful procedure to compel the production of records, unless the licensee or host consents to disclosure. *See* Doc. 29-2 §§ 4-6-300(f)(3), 4-14-040(b)(9).

residential rental advertising platforms." A "short term residential rental intermediary," such as Airbnb, is "any person who, for compensation or a fee: (1) uses a platform to connect guests with a short term residential rental provider for the purpose of renting a short term residential rental, and (2) primarily lists shared housing units on its platform." *Id.* § 4-13-100. Intermediaries must bulk register all shared housing units listed on their platform with the City and remove listings without valid registration numbers. *Id.* § 4-13-230(a). The SHO also requires intermediaries to provide reports to the City regarding rental activity on their platforms, typically in anonymized formats. *Id.* § 4-13-240(f).

A "short term residential rental advertising platform," such as HomeAway or VRBO, is "any person who, for compensation or a fee: (1) uses a platform to connect guests with a short term residential rental provider for the purpose of renting a short term residential rental, and (2) primarily lists licensed bed-and-breakfast establishments, vacation rentals or hotels on its platform or dwelling units that require a license under this Code to engage in the business of short term residential rental."[8] *Id.* § 4-13-100. The SHO requires these platforms to provide unit registration data to the City, but the reporting requirements are not as extensive as for intermediaries because the vacation rental licensees register themselves. *Id.* § 4-13-040.

After the City passed the SHO, Keep Chicago Livable and Wolf filed this suit, seeking to enjoin its implementation. Keep Chicago Livable is a non-profit formed by Chicago residents who participate in home sharing as hosts to "educate other Chicago owners and renters as to their rights and duties to participate in home sharing and to assist them with compliance with both state and local law as well as internally developed 'best practices' for responsible home sharing

---

[8] At the preliminary injunction hearing, the parties disputed whether the term "short term residential rental advertising platform" encompasses only online platforms or also offline platforms, such as newspapers. The Court need not resolve the issue at this time, although it notes that the confusion may stem from the definition of "platform" and how that term is subsequently used in the definitions for "short term residential rental intermediary" and "short term residential rental advertising platform" in § 4-13-100.

and assist homeowners with compliance with applicable regulations." Doc. 29 ¶ 13. The individual Plaintiffs, and others like them, use Airbnb for social interactions and for the sense of community it provides. As hosts, they claim to charge a fee because "[i]t is impossible for a host to create a listing on Airbnb – and thus, impossible for a person wishing to host a guest from this deep, vetted and insured guest pool – without including and maintaining a price term." Doc. 29 ¶ 35; *see also id.* ¶ 38 ("The primary purpose for many hosts on platforms such as Airbnb is not necessarily to obtain a profit. Hosts enjoy sharing their homes with guests for many reasons that have nothing to do with making a profit, such as making new friends, learning about different cultures, showing off one's home and city to a newcomer or simply out of empathy for a traveler who could not otherwise afford to stay in a downtown hotel.").

In reply to the original preliminary injunction motion, Keep Chicago Livable and Wolf included several affidavits from Airbnb hosts, some of whom have since become named Plaintiffs in the litigation. Wolf, a Chicago resident who has served as an Airbnb host and guest since 2012 but recently took down his listing because of this litigation, states that Airbnb has allowed him to meet a diverse group of people while in Chicago, "underscor[ing] the importance of cultural exchange." Doc. 23-1 at 2. Aside from the social benefits, without Airbnb, he would not have been "able to afford the cost of living in [his] building and as a graduate student." *Id.* His building is subject to the SHO's maximum cap provision, and he believes there may be over six Airbnb listings in his building. Adam Fried owns a single family home in Bucktown, which he lists "sporadically" on Airbnb. *Id.* at 4. He says he does not use Airbnb "solely or even primarily for profit-motivated reasons" but instead for security reasons when he is out of town because he would "prefer to be paid rather than to pay for 'house sitting' services." *Id.* Valerie Landis indicates that she used Airbnb "[d]uring a period of temporary unemployment" when she

"enjoyed the company of [her] hand-picked guests." *Id.* at 7. She has vocally opposed the SHO, which she claims resulted in harassment from her Alderman's office and caused her condominium association to fine her for violating its rules by having Airbnb listings for her second bedroom. Ron Sattar, who owns a single family home in Chicago, had a complaint filed against him by the City for operating an unlicensed bed-and-breakfast in July 2016. The City allegedly brought the complaint based on reports from his neighbor that he was booking guests through Airbnb but dropped the complaint provided he fix some minor electrical issues with his home. Sattar claims his neighbor has repeatedly harassed him and his guests without cause or justification. Antoinette Wonsey owns a single family home in Englewood and lists rooms for rent on Airbnb, using the money she earns to renovate her home and support herself. She uses a pseudonym on Airbnb, allegedly "to avoid harassment from City of Chicago police officers," harassment which has led her to file a federal lawsuit.[9] *Id.* at 29. Both David Boyd and Susan Maller live in an apartment building at 355 E. Ohio Street, where their landlord changed the locks on their units, allegedly based on rumors that they had listings on Airbnb in violation of their leases. Finally, after the condominium association learned of his activities on Airbnb, Waseem Gorgi was fined for renting out his condominium on Airbnb in violation of the condominium association rules.

## LEGAL STANDARD

The party seeking a preliminary injunction must first show: (1) it is reasonably likely to succeed on the merits, (2) it will suffer irreparable harm absent an injunction before final resolution of its claims, and (3) it has no adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the

---

[9] That lawsuit, *Wonsey v. City of Chicago*, No. 16 C 9936, makes no mention of the fact that the alleged harassment occurred because of Wonsey's Airbnb activities.

moving party fails to demonstrate any of these three requirements, the Court will deny the motion. *Id.* But if the moving party meets this threshold showing, the Court attempts to "minimize the cost of potential error" by "balanc[ing] the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). The Seventh Circuit has described this balancing test as a "sliding scale" in which "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984)).

## ANALYSIS

### I. Likelihood of Success

"[T]he threshold for demonstrating a likelihood of success on the merits is low," with Plaintiffs needing only to demonstrate that their chances of prevailing are "better than negligible." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). The Court addresses whether Plaintiffs have met this low threshold on their First Amendment and due process claims. With respect to the First Amendment claims, "the likelihood of success on the merits will often be the determinative factor" in determining whether a preliminary injunction should issue. *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004).

### A. First Amendment Claims

Plaintiffs bring three claims under the First Amendment, arguing that the SHO (1) constitutes an unconstitutional prior restraint on speech; (2) constitutes unconstitutional compelled speech, even if viewed as commercial speech; and (3) amounts to impermissible content-based regulation of speech because it specifically targets internet-based home sharing. The City argues, however, that the Court need not consider the substance of Plaintiffs' arguments on these claims because Plaintiffs will not be able to establish that the SHO regulates speech. It contends that the SHO does not implicate the First Amendment's protections on speech because the SHO instead regulates the business activity of the short-term rental industry, an economic transaction, with any restriction on speech merely incidental to the valid economic regulation. The SHO, according to the City, is just the latest exercise of the City's authority to license and regulate businesses, adding a new type of commercial activity—short-term rentals—to a long list of regulated business activities.

"[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011). "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.*; *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) (statute did not violate First Amendment because it affected what law schools "must *do* . . . not what they may or may not *say*"). The First Amendment protects speech and conduct but extends "only to conduct that is inherently expressive." *Rumsfeld*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive

10

conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

Here, Plaintiffs have not demonstrated that they are likely to succeed in establishing that the SHO targets expressive conduct or speech instead of economic activity. Plaintiffs do not suggest, for example, that the SHO falls outside the purview of a pure business regulation because it targets specific speakers or "the idea or message expressed." *Cf. Reed v. Town of Gilbert*, --- U.S. ----, 135 S. Ct. 2218, 2224, 2227, 192 L. Ed. 2d 236 (2015) (invalidating a municipal code that imposed different restrictions on outdoor signs based on the message of the signs); *Sorrell*, 564 U.S. at 563–64 (striking down statute that "disfavor[ed] marketing, that is speech with a particular content" and "disfavor[ed] specific speakers, namely pharmaceutical manufacturers," by restricting the "sale, disclosure, and use of prescriber-identifying information"); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991) (statute restricting a criminal's right to profit from literary or other works based on crime fell within the First Amendment's protections because it addressed "income derived from expressive activity" and was "directed only at works with a specified content," i.e., those concerning the reenactment of a crime).

Instead, Plaintiffs contend that the SHO cannot be considered a business regulation because home sharing is not purely a commercial undertaking. They provide examples of non-commercial reasons for signing up as a host, "such as making new friends, learning about different cultures, showing off one's home and city to a newcomer or simply out of empathy for a traveler who could not otherwise afford to stay in a downtown hotel." Doc. 29 ¶ 38. In essence, Plaintiffs argue that home sharing does not provide a fungible good or service but rather a personalized experience, taking it outside the realm of economic conduct. Accordingly,

11

Plaintiffs contend that the SHO regulates expressive conduct by mandating that hosts or licensees include a registration number in their listings, for example. But Plaintiffs must admit that, regardless of whether they also derive some social benefit from home sharing, they receive money in the process of renting their units to guests and guests receive a place to stay in exchange.[10] Despite Plaintiffs' best efforts to creatively argue otherwise, home sharing does provide something fungible, establishing, at base, a commercial relationship between a host and guest.[11] *See* SHO § 4-14-010 (defining a shared housing unit as "a dwelling unit . . . that is rented . . . for transient occupancy by guests").

The City points out that, following Plaintiffs' logic, any business license requirement would involve First Amendment protections because most businesses or individuals subject to licensing engage not only in commercial activity but also have social interactions with customers or others. Indeed, Plaintiffs' position is untenable and has recently been rejected: "regulation of conduct may proceed even if the person who wants to violate the legal rule proposes to express an idea" where the regulation applies to economic transactions, such as peddling, and applies to all sales alike. *See Left Field Media LLC v. City of Chicago, Ill.*, 822 F.3d 988, 990 (7th Cir. 2016) (affirming denial of preliminary injunction challenging ban on peddling outside Wrigley

---

[10] A number of the affidavits submitted in connection with Plaintiffs' reply to the preliminary injunction motion underscore the fact that hosts engage in home sharing not only for its social benefits but also because they derive income from doing so. For example, Wolf stated that "[b]ut for Airbnb," he would not have been "able to afford the cost of living in my building, among other things. Doc. 23-1 at 2. Fried indicated that he used Airbnb while he was away from his house because he "would prefer to be paid rather than to pay for 'house sitting' services," revealing an economic calculus behind his decision. *Id.* at 4. Wonsey states that she uses the money she earns through Airbnb to "restore and renovate [her] historic home and to otherwise pay the costs of living in Chicago." *Id.* at 29.

[11] Plaintiffs argue in reply, without citation, that "the Ordinance is presumptively unconstitutional unless it is true that *every* host on Airbnb is doing so as a 'business activity.'" Doc. 23 at 3. Plaintiffs then try to analogize to tax and ERISA definitions for determining whether an activity constitutes a trade or business. *See Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23, 35, 107 S. Ct. 980, 94 L. Ed. 2d 25 (1987); *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 642 (7th Cir. 2001). But these cases have not been applied in the First Amendment context nor does the Court find it appropriate to extend them to the situation here.

Field where plaintiff wanted to sell magazines, finding that regulation of peddling on sidewalk did not regulate speech but rather conduct). Like with peddlers who hawk their goods but are lawfully subject to a regulation as to where they sell those goods, the City may lawfully subject home sharing to regulation without implicating the First Amendment because the SHO regulates conduct—the temporary rental of property in exchange for money—instead of speech. *See id.*; *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (minimum wage ordinance did not implicate First Amendment protections because it was "plainly an economic regulation that does not target speech or expressive conduct," with the "decision of a franchisor and a franchisee to form a business relationship and their resulting business activities" having no characteristics of expressive conduct); *Airbnb, Inc. v. City & County of San Francisco*, --- F. Supp. 3d ----, 2016 WL 6599821, at *6–7 (N.D. Cal. Nov. 8, 2016) (in denying preliminary injunction that claimed short-term rental regulations violated the First Amendment, finding that Airbnb facilitated "business transaction[s] to secure a rental, not conduct with a significant expressive element"); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third, & Fourth Dep'ts, App. Div. of the Sup. Ct. of the State of N.Y.*, 118 F. Supp. 3d 554, 569 (S.D.N.Y. 2015) (laws preventing law firm from seeking non-lawyer equity investors were merely "restriction[s] on a commercial practice" that "fall outside the purview of the First Amendment even if they impose 'incidental burdens on speech'" (alteration in original)). That some hosts or licensees also derive a social benefit from home sharing makes no difference to the dispositive question of whether the SHO regulates economic activity. *Int'l Franchise Ass'n*, 803 F.3d at 408 (acknowledging that ordinance was "not wholly unrelated to a communicative component, but that in itself does not trigger First Amendment scrutiny").

13

Because the SHO does not target speech but rather the business practices associated with home sharing, only incidentally burdening speech if at all, the SHO falls outside the purview of the First Amendment. Thus, the Court finds that Plaintiffs are unlikely to prevail on the merits of their First Amendment claims and need not delve into the specifics of the three substantive claims they bring under the First Amendment.

### B. Due Process Vagueness Claim (Count VIII)

Plaintiffs also argue that the Court should enter a preliminary injunction because the SHO is void for vagueness in violation of the Fourteenth Amendment's due process clause. Although Plaintiffs set forth numerous bases for their void for vagueness challenge in their original and amended complaints, broadly complaining that the SHO "is too long, vague and prolix for a person of common intelligence to understand" and then more specifically alleging issues with the definition of "guest suites" and what it means for a host to provide food to a guest, *see* Doc. 1 ¶¶ 226–243, Doc. 29 ¶¶ 75–89, in their preliminary injunction, they highlight only the alleged difficulties in implementing the law as it relates to the maximum caps provision. Plaintiffs' failure to develop any substantive argument as to these other provisions, instead attempting to merely incorporate the allegations of the complaint by reference, waives those challenges. *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000))). And even their vagueness challenge to the maximum caps provision fails on similar grounds because Plaintiffs do not set forth the legal or factual basis for why they are likely to succeed on this aspect of their claim, and the Court is not obligated to construct Plaintiffs' arguments for them. *See Nelson v. Napolitano*, 657 F.3d

586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel").

Even so, Plaintiffs have not demonstrated a likelihood of success, for they have not suggested how the maximum caps provision is impermissibly vague in all its applications. "[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 132 S. Ct. 2307, 2317, 183 L. Ed. 2d 234 (2012). A regulation may be found "impermissibly vague if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001).

In evaluating Plaintiffs' facial challenge to the maximum caps provision, the Court first considers "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). But because the Court has already found that the SHO does not implicate the First Amendment,[12] Plaintiffs' vagueness challenge survives only if the SHO "is impermissibly vague in all of its applications."[13] *Id.* at 495.

---

[12] The Court notes that, in their amended complaint, Plaintiffs also assert that the SHO infringes on their right to intimate and expressive association and right to equal protection. But because Plaintiffs did not develop those claims at the time of the preliminary injunction hearing nor do they connect the issues in their amended motion and instead have agreed to the Court's deciding the void for vagueness challenge without addressing their newly asserted constitutional claims, the Court proceeds to address the due process challenge under the assumption that it does not reach a substantial amount of constitutionally protected conduct.

[13] In reply, Plaintiffs briefly state that they do not have to show that the SHO is impermissibly vague in all its applications because the overbreadth of the SHO implicates the First Amendment. But the Court cannot take into account arguments raised in a reply brief, particularly undeveloped ones concerning overbreadth, as here. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments

The City argues that Plaintiffs cannot show that the SHO is impermissibly vague because the SHO is an economic regulation that imposes civil penalties for noncompliance. *See id.* at 498 ("[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." (footnotes omitted)). The City also argues that the challenged provisions have not yet gone into effect and could be further clarified, and, indeed, Plaintiffs indicate that they have sought clarification, albeit to no avail. *See id.* ("[T]he regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process."). But even setting this aside, Plaintiffs' challenge fails at this stage because they have not provided the Court with an explanation for why the maximum caps provision is vague in all of its applications.[14] Instead, they themselves make only vague references to the simplicity of the argument and how it needs

---

raised for the first time in a reply brief are waived."). Plaintiffs also disclaimed any overbreadth argument during oral argument on the motion.

[14] Instead of addressing the maximum caps provision during oral argument, Plaintiffs' counsel focused on the definition of guest suites in the SHO. The City Council since amended the definition of "guest suite" to read: "a dwelling unit that is available for rent or for hire for transient occupancy solely by the invitees or family members of residents of the building which contains the dwelling unit, and is not offered, advertised or made available for rent or hire to members of the general public." Doc. 29-2 § 4-6-300(a). Originally, the definition used the term "guests" instead of "invitees," which Plaintiffs argued made the SHO nonsensical because the SHO also used "guest" in the definition of "vacation rental" and "shared housing unit," thus making it impossible to determine what the difference was between a "guest suite," which was unregulated, and a "vacation rental" or "shared housing unit," which was regulated. But regardless of whether the term "guest" or "invitee" is used, Plaintiffs' argument that the definitional sections render the SHO void in all its applications fails because, as the City pointed out at the preliminary injunction hearing and Plaintiffs demonstrate by way of attachments to their amended complaint, certain condominium or apartment buildings offer guest suites as amenities for their tenants, which are available only to guests or invitees of residents of the building. *See, e.g.*, Doc. 29-3 at 4–6 (booking page for Eugenie Terrace guest suite, providing that the suite "can only be reserved by current Eugenie Terrace residents" and that the submission of the form must be made by "a current resident of Eugenie Terrace whose lease is valid through the requested reservation dates"). As such, these guest suites are not available for rent to members of the general public, differentiating them from vacation rentals or shared housing units. The Court rejects Plaintiffs' argument, made during oral argument, that sites like Airbnb do not offer listings to the general public because any individual can browse the listings without having created a profile and those listing may be booked by anyone who creates an Airbnb account.

no further explanation. But such a conclusory explanation does not suffice to carry Plaintiffs' burden of demonstrating likelihood of success on the due process claim.[15]

## II.     Irreparable Harm and Inadequate Remedy at Law

Having found that Plaintiffs have not demonstrated a likelihood of success on the merits, the Court also finds that they have not sufficiently established irreparable harm or an inadequate remedy at law. Indeed, Plaintiffs' arguments on these points, at least with respect to their First Amendment claims (having made no argument on these requirements with respect to their due process claim), depended on a showing of success on the merits. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury, and the quantification of injury is difficult and damages are therefore not an adequate remedy." (internal quotation marks omitted) (citations omitted)). Without any additional arguments as to these issues, the Court finds that Plaintiffs have not made the threshold showing required for issuance of preliminary injunctive relief. *See Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1204 (7th Cir. 1996) (finding it to be an abuse of discretion to issue an injunction "based on nothing but speculation and conjecture").

## III.    Balance of Hardships

Although the Court need not address the balance of hardships because Plaintiffs have failed to make the required threshold showing, *see Girl Scouts*, 549 F.3d at 1086 ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction."), the Court finds it prudent to briefly address the balance of hardships, *id.* at 1087 (encouraging district court "to conduct at least a cursory examination" of the balance of hardships where the court "decides that a party moving for a

---

[15] The Court notes that it raised several vagueness concerns with the SHO with the parties during oral argument on the preliminary injunction motion. The Court does not address those here, however, as they are outside the scope of Plaintiffs' motion.

17

preliminary injunction has not satisfied one of the threshold requirements," noting that "[d]oing so expedites [appellate] review and helps to protect the interests of the parties"). The Court notes that Plaintiffs again failed to meaningfully develop an argument on the issue, raising substantive arguments only in their reply brief. Such failure is unacceptable, particularly because Plaintiffs have the burden of demonstrating an injunction's necessity. *Ind. Forest Alliance v. McDonald*, No. 1:16-cv-03297-JMS-MPB, 2017 WL 131739, at *11 (S.D. Ind. Jan. 13, 2017 (finding plaintiffs would not prevail at the balancing phase where, among other things, they did not address the effects of an injunction on the public interest). To the extent the balance of hardships comes into play, using the sliding scale approach, the balance would have to weigh heavily in Plaintiffs' favor where the Court has found they are unlikely to succeed on the merits of their claims. *Girl Scouts*, 549 F.3d at 1086 (describing sliding scale approach). It is true that, in First Amendment cases, "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill.*, 679 F.3d at 590; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). But here, the Court has found that the SHO does not implicate First Amendment concerns. In reply, Plaintiffs raise concerns of harassment by the City and others (landlords, neighbors, condominium associations) if hosts lose their anonymity by having to register and comply with the SHO. The City responds that the affidavits submitted to support such concerns demonstrate that hosts are already widely recognizable, meaning that claims of harassment arising from the SHO should not be countenanced and that instead the SHO's

18

registration requirements would allow the City to cut down on any claimed harassment issues and putting into place a more orderly system for the home sharing industry.

The City also maintains that because the SHO imposes commonplace regulations on business activity and does not restrict speech or social interaction between hosts and guests, any harm to Plaintiffs in denying the injunction is minimal. The City claims that, on the other hand, delays in implementation harm the City and the public because the City has a substantial interest in regulating the short-term rental market, ensuring its safety, and protecting the residential character of the buildings and neighborhoods in which short-term rentals are occurring. The delay in implementing the SHO deprives citizens of their elected representatives' solution to issues surrounding the emerging short-term rental industry. *See Maryland v. King*, --- U.S. ----, 133 S. Ct. 1, 3, 183 L. Ed. 2d 667 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). This, the City argues, harms the public interest. Taken together, the arguments before the Court on the balance of hardships weigh against an injunction.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion for a preliminary injunction [11]. To the extent Plaintiffs' amended motion for a preliminary injunction [30] seeks an injunction based on their First Amendment and Fourteenth Amendment due process claims, the Court denies that portion of the amended motion as well.

Dated: March 13, 2017

_____
SARA L. ELLIS
United States District Judge